**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| **JOSEPH HUGH NOLAN, III, individually, on behalf of the Sonic Automotive, Inc. 401(k) Plan & Trust and Northern California ULA 401(k) Plan and on behalf of all similarly situated participants and beneficiaries of the Plans,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SONIC AUTOMOTIVE, INC.; THE ADMINISTRATIVE COMMITTEE OF SONIC AUTOMOTIVE, INC. 401(K) PLAN & TRUST, SONIC AUTOMOTIVE, INC. NORTHERN CALIFORNIA ULA 401(K) PLAN, ECHOPARK AND DRIVESELECT 401(K) PLAN; JOHN AND JANE DOES 1-30 IN THEIR CAPACITIES AS MEMBERS OF THE ADMINISTRATIVE COMMITTEE,**<br><br>**Defendants.** | **CIVIL ACTION NO: 3:25-cv-00474-KDB-SCR**<br><br>**JURY TRIAL DEMANDED** |

**<u>FIRST AMENDED CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

I. INTRODUCTION .......... 1

II. THE PARTIES .......... 2

A. Plaintiff .......... 2

B. Defendant .......... 2

III. JURISDICTION AND VENUE .......... 3

IV. PLAINTIFF'S STANDING .......... 5

V. DEFENDANTS' FIDUCIARY OBLIGATIONS .......... 5

VI. FACTUAL ALLEGATIONS .......... 8

A. The Plan .......... 8

B. The Plan's IPS and its Failure to Specify Prudent Selection & Monitoring Standards .......... 9

C. The IPS Is Non-Specific and Fails to Include Standard Fund-Evaluation Metrics .......... 11

D. The IPS Uses Overly Generous Peer Fund Evaluation Metrics .......... 12

E. The Committee Failed to Follow Sonic's IPS When Choosing Plan Investments 17

F. The Committee Failed to Conduct Periodic Reviews of Investment Performance .......... 18

G. The Committee Chose More Expensive Share Classes .......... 19

H. The Committee Failed to Fulfill ERISA's Duty of Prudence When It Selected and Maintained the MFS Growth Fund, the MFS Value Fund, and the ClearBridge International Growth Fund .......... 19

I. The Committee Lacked a Prudent Process When It Selected and Maintained the MFS Growth Fund as a Plan Option .......... 19

J. The MFS Growth Fund Consistently Underperformed, Losing over $28 Million to the Russell 1000 Growth Index .......... 22

K. The Committee Ignored Red Flags When Selecting and Maintaining The MFS Growth Fund .......... 25

L. The Committee Lacked a Prudent Process When Selecting and Maintaining the MFS Value Fund as a Plan Option .......... 29

M. The MFS Value Fund's Poor Performance .......... 29

N. The Committee Ignored the MFS Value Fund's Alarming Style Drift When Selecting and Maintaining the Fund ..... 33

O. The Committee Lacked Prudence when Selecting and Maintaining the ClearBridge International Growth Share Class ..... 33

P. Defendants' Pattern of Plan Mismanagement ..... 35

Q. Defendants Violated ERISA's Duty of Loyalty by Selecting More Expensive Share Classes ..... 37

R. The Committee Ignored its IPS and Violated its Fiduciary Duty of loyalty to Plan Participants by Choosing More Expensive Options that Benefited Other Parties at the Cost of the Participants ..... 40

S. The Committee Engaged in Prohibited Transactions with IRA Group ..... 43

i. IRA Group's Compensation was Unreasonable ..... 45

ii. IRA Group Selected and Maintained Imprudent Investments ..... 49

VII. CLASS ALLEGATIONS ..... 50

VIII. TIMELINESS ..... 54

COUNT I: Breach of Fiduciary Duty of Prudence (Against all Defendants) ..... 54

COUNT II: Breach of Fiduciary Duty of Loyalty ..... 56

COUNT III: Breach of Co-Fiduciary Duties ..... 57

COUNT IV: Breach of Fiduciary Duty of Prudence (Against Sonic) ..... 58

COUNT V: Violation of 29 U.S.C. § 1106(a) Prohibited Transactions ..... 60

COUNT VI: Failure to Act in Accordance with Governing Plan Documents (ERISA, 29 U.S.C. § 1104(a)(1)(D)) ..... 62

IX. PRAYER FOR RELIEF ..... 64

## I. INTRODUCTION

1. Plaintiff Joseph Hugh Nolan, III individually, as representative of the class, and on behalf of the Sonic Automotive, Inc. 401(k) Plan & Trust, Sonic Automotive, Inc. and Northern California ULA 401(k) Plan (collectively, the "Plan") brings this action under 29 U.S.C. §§ 1132(a) (2) and (3) & 409(a) against Defendants (1) Sonic Automotive, Inc. ("Sonic" or the "Company"), (2) the administrative 401(k) plan Committee for the plans ("Committee"), (3) John and Jane Does 1-30 in their capacities as members of the Committee (collectively, "Defendants"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income & Security Act (ERISA), U.S.C. 29 1001, et seq.

2. Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (i.e., 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's de facto retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner by which participants bear the risk of high fees and investment underperformance.

3. As fiduciaries to the Plan, Defendants were always obligated to act prudently and for the exclusive benefit of participants and beneficiaries. Defendants did not meet such obligations because they consistently selected higher cost, lower-performing, investment options that reduced Plan participants' retirement funds.

4. Further, Defendants engaged in prohibited transactions with their investment advisor by paying unreasonable amounts for unnecessary services.

5. As a result of these breaches of fiduciary duties, Plaintiff and the proposed class suffered tens of millions of dollars in losses.

6. To remedy Defendants' fiduciary breaches and prohibited transactions further described below, Plaintiff brings this action individually and on behalf of the Plan to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan from, January 1, 2019 to the date of judgment (the "Class Period") and for other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. U.S.C. § 1102(a)(3).

## II. THE PARTIES

### A. Plaintiff

7. Plaintiff brings this suit individually, on behalf of the Plan, and on behalf of a class of participants and beneficiaries of the Plan. At all relevant times, and during the Class Period, Plaintiff, by virtue of his employment with Sonic and participation in the Plan,[1] was a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

8. At all relevant times during the Class Period, Plaintiff was invested in the investment options provided by the Plan, including, but not limited to, the poorly performing funds discussed herein (the MFS Growth Fund, the MFS Value Fund, the Putnam Stable Value Fund, and the ClearBridge International Growth Fund).

9. As a result of Defendants' mismanagement of the Plan and violations of ERISA, Plaintiff was subject to excessive fees and underperformance and suffered financial losses.

### B. Defendants

10. Defendant Sonic is a Fortune 500 company and the fifth largest automotive retailer in the United States when measured by total revenues.

[1] Specifically, Plaintiff was a participant in the Sonic Automotive, Inc. 401(k) Plan & Trust.

11. Defendant Sonic is a Delaware corporation with a principal place of business in Charlotte, North Carolina.

12. Sonic is the sponsor of the Plan per ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B); the Plan administrator under ERISA § 3(16), 29 U.S.C. § 1002(16); a party in interest under ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(2)(A), to the extent that it appointed members of the Committee and otherwise exercised discretion over the administration and management of the Plan and/or control of Plan assets.

13. At all relevant times, the Committee is a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A) and a Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it had or exercised discretion over the administration or management of the Plan and/or control of Plan assets.

14. At all relevant times, Defendants John Does 1-30, as members of the Committee, were parties in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority over the administration or management of the Plan, and/or control of Plan assets. Plaintiff will seek leave to amend the Complaint to name each of these John Does once they ascertain their identities in discovery. The Committee and John Does 1-30 will be referred to collectively as the "Committee."

## III. JURISDICTION AND VENUE

15. This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

16. Venue lies in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district in which the subject Plan is administered and where at least one of the alleged breaches took place.

## IV. PLAINTIFF'S STANDING

17. Plaintiff, a participant in the Sonic Automotive, Inc. 401(k) Plan & Trust, brings this action on behalf of himself and all similarly situated participants and beneficiaries of that Plan and the Sonic Automotive, Inc. and Northern California ULA 401(k) Plan.

18. Upon information and belief, both plans are sponsored, maintained, and administered by Sonic and share the same fiduciaries.

19. Upon information and belief, both plans are managed, administered, and operated pursuant to identical or substantially similar policies, procedures, fiduciary oversight, and administrative practices by the same named fiduciaries and other responsible parties in connection with plan investments, fee allocations, recordkeeping, disclosures, and participant communications.

20. Upon information and belief, because the plans are functionally indistinguishable in governance and administration and constitute components of a unitary employee benefits program sponsored by a single employer, the fiduciary breaches, statutory violations, and harm suffered pursuant to each plan are the same in nature and scope.

21. Plaintiff's participation in the Sonic Automotive, Inc. 401(k) Plan & Trust thus confers standing to assert claims on behalf of himself and all participants similarly situated across the identically managed Plans. Due to the common administration and shared fiduciaries, the misconduct alleged herein affected each Plan equally and warrants collective treatment under ERISA, including certification of a class action.

22. As a Plan participant and holder of the disputed funds, Plaintiff has standing to bring claims on behalf of the Plan pursuant to 29 U.S.C. §1132(a)(2), as he is a participant seeking appropriate relief under 29 U.S.C. §1109.

23. Plaintiff has standing to bring claims on behalf of all holders of the disputed funds in the Plan because the alleged harms to holders of the funds can be traced to the same challenged conduct: the imprudent and disloyal process that Defendants used to select, monitor, and retain the disputed funds and otherwise administer the Plan.

## V. DEFENDANTS' FIDUCIARY OBLIGATIONS

24. Sonic is the Plan and Program administrator under 29 U.S.C. § 1002(16)(A)(i), the Plan and Program sponsor under 29 U.S.C. § 1002 (16)(B), and a "named fiduciary" under the Plan and Program instrument and 29 U.S.C. § 1002(a). As such, Sonic has fiduciary responsibility for the Plan's and Program's investments and administrative expenses.

25. At all relevant times, the Committee was a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it had or exercised discretion over the administration or management of the Plan and/or control of Plan assets, as well as a named fiduciary within the IPS. As such, the Committee has fiduciary responsibility for the Plan's and Program's investments and administrative expenses.

26. ERISA imposes strict fiduciary duties upon the Defendants as fiduciaries of the Plan, including the duty of prudence, the duty to adhere to governing Plan documents, the duty of loyalty, and the requirement to refrain from prohibited transactions. These duties apply to all fiduciary acts, including the Defendants' retention of investment options for the Plan.

27. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B). Accordingly, fiduciaries must vigorously and independently investigate each of the Plan's investment options with the skill of a prudent investor.

28. As part of its fiduciary duty, the Defendants "ha[ve] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530. If an investment is imprudent, "must dispose of it within a reasonable time." *Id.* (citation omitted).

29. In addition, ERISA requires each fiduciary to act "in accordance with the documents and instruments governing the plan," except when those documents themselves violate ERISA. 29 U.S.C. § 1104(a)(1)(D). One such governing document that fiduciaries are required to adhere to is the Plan's Investment Policy Statement ("IPS").

30. 29 U.S.C. § 1104(a)(1)(C) further provides that a fiduciary shall discharge their duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

31. Under ERISA's duty of loyalty, Plan fiduciaries must exercise their discretion "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose" of "providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1). This requires Plan fiduciaries to act with an "eye single" to the interests of Plan participants and beneficiaries and to "exclude all selfish interest and all consideration of the interests of third persons." *Pegram*,

530 U.S. at 224 (citation omitted). Fiduciaries violate that duty when they make investment decisions even in part to benefit themselves or third parties.

32. ERISA further "supplements the fiduciaries' general duty of loyalty to the Plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-42 (2000); *Cunningham v. Cornell Univ.*, 145 S. Ct. 1020 (2025). Among these prohibited transactions, a fiduciary "shall not cause the plan to engage in a transaction" if the fiduciary "knows or should know" that it constitutes a "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" (29 U.S.C. § 1106(a)(1)(D)) and may not "deal with the assets of the plan in his own interest or for his own account" (29 U.S.C. § 1106(b)(1)).

33. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

34. Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI. FACTUAL ALLEGATIONS

### A. The Plan

35. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401.

36. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").

37. At all relevant times, the Plan was a 401(k) plan. The Plan covers substantially all employees of Sonic Automotive, Inc. (the "Company"). The Company is the Plan sponsor.

38. The Company has delegated certain administrative and fiduciary responsibilities to the Committee. The Committee is charged with the responsibility for the prudent selection and monitoring of the investment options made available in the Plan.

39. The Plan's assets are owned by and held in the name of the Plan.

40. Delaware Charter Guarantee & Trust Company d/b/a Principal Trust Company serves as the Plan's directed trustee ("Delaware Charter" or "the *directed* trustee").

41. The Investment Research & Advisory Group serves as the Plan's fiduciary advisor ("IRA Group" or "Investment Advisor"). IRA Group serves as an investment advisor to the Plan pursuant to ERISA § 3(21).

42. Defined contribution retirement plans are typically classified as: "Micro" plans (less than $5 million in assets); "Small" plans ($5 million to less than $50 million); "Mid" plans

($50 million to less than $200 million); "Large" plans ($200 million to less than $1 billion); and "Mega" plans (more than $1 billion).

43. At all times relevant to this Complaint, the Sonic Automotive, Inc. 401(k) Plan & Trust, had approximately $490,957,282 in assets and 7088 participants in 2023. The Sonic Automotive, Inc. and Northern California ULA 401(k) plan had approximately $32,117,150 in assets and approximately 499 participants in 2023.

44. The Plan currently offers mutual funds and common collective trust funds as investment options for participants.

45. Plan participants allocate their wages into the investment choices provided by the Committee. Participants own shares beneficially and have a recordkeeper account to track cash flows, gains, and losses.

46. Each participant can change investments each day, and participant allocations are updated every business day based on participant wage deposits, earnings, or account balances.

**B. The Plan's IPS and its Failure to Specify Prudent Selection & Monitoring Standards**

47. An investment policy statement is crucial for fiduciaries to manage plan assets effectively and comply with ERISA's fiduciary responsibilities. It helps ensure that investment decisions are made with an "eye single" to the interests of plan participants and beneficiaries. An investment policy statement is a document that outlines the investment strategy, objectives, and guidelines for managing a plan's assets. It serves as a guide for fiduciaries in making investment decisions and ensuring that the plan's investments align with its goals and risk tolerance of Plan participants. An investment policy statement is typically developed through mutual agreement among the plan's board, investment managers, and other stakeholders.

48. Under ERISA, fiduciaries are required to act prudently and in the best interest of plan participants and beneficiaries. This includes adhering to the plan documents, which encompass the investment policy statement.[2] The investment policy statement is integral to fulfilling fiduciary duties as it provides a framework for investment decisions and helps ensure compliance with ERISA's standards of care and loyalty.[3]

49. The Committee utilizes an Investment Policy Statement, entitled "Investment Policy Statement Sonic Automotive Inc. EchoPark Automotive, Inc." (the "IPS" or "Sonic's IPS") when researching and compiling investment options.

50. Upon information and belief, IRA Group assisted with the creation of Sonic's IPS.[4]

51. The stated purpose of the IPS is to "assist the Committee and the Investment Advisor in the management of Plan investments and provide a framework for the selection, management, monitoring, and evaluation of the investment options made available to participants in each plan."

52. But Sonic's IPS wholly fails to provide a prudent framework for fulfilling the Committee's fiduciary duties.

53. Specifically, Sonic's IPS: (1) is non-specific and vague, and fails to include standard fund-evaluation metrics; and (2) the evaluation metrics that are included are overly generous and allow the Committee to imprudently select and maintain poorly performing funds.

---

[2] 29 C.F.R. § 2550.404a-1 Investment duties.

[3] Bloomberg Law, ERISA Fiduciary Law, Chapter 5. Investment Management by Plan Fiduciaries.

[4] *See* https://iragroup.com/institutional/ (last visited September 5, 2025)

### C. The IPS Is Non-Specific and Fails to Include Standard Fund-Evaluation Metrics

54. The stated "INVESTMENT POLICY OBJECTIVES" of the Sonic IPS simply parrot ERISA requirements, stating:

> . . . options under the Plans will be *selected and monitored in a manner consistent with the fiduciary and other applicable standards of ERISA*, including (but not limited to): (a) the prudent person rule, and (b) the exclusive benefit rule. The Committee seeks to provide a broad range of investment options that will enable participants to direct the investment of their individual accounts under the Plans in accordance with their individual risk tolerance, savings time horizon, and financial goals, and in accordance with standards for participant investment direction under ERISA. In selecting investment options, the *Committee also seeks to select investment options with competitive returns based on risk level and to obtain investment options at a reasonable cost*. (emphasis added).

55. Sonic's IPS includes a set of selection and retention factors governing all Plan investments.

56. The Committee has used identical selection and retention factors since the Plan's inception on 10/1/1994.

57. Sonic's IPS criteria and/or factors for selection and retention are non-specific compared to standard investment monitoring factors that provide more detail, such as (1) standard deviation, (2) portfolio manager selection metrics (tenure, fund's asset sizes, etc.), (3) expense ratio requirements, (4) share class requirements, (5) track record, and (6) style consistency.

58. Sonic's IPS fails to include any specific fund manager evaluation metrics, such as Sharpe ratio, Treynor, information ratio (IR), standard deviation, and/or capture ratios.

59. Rather, Sonic's IPS simply states that: "[t]he Committee will...monitor subjective criteria which may impact investment performance over time which may include but not be limited to:

- Investment objective
- Portfolio management structure

• Portfolio management tenure
• Asset levels
• Eligible investments
• Expenses
• Risk measurements
• Portfolio diversification"

60. Sonic's IPS is therefore vague and fails to outline evaluation metrics sufficient to allow the Committee to prudently monitor and select investment options for the trust.

**D. The IPS Uses Overly Generous Peer Fund Evaluation Metrics**

61. Sonic's IPS investment evaluation principles are outlined in the sections "PERFORMANCE OBJECTIVES" in the IPS.

62. Defendants evaluate the Plan's investments based on the parameters that the investments should: "Attain a competitive ranking above the 50th (or "35th" or "25th") percentile among funds within a similar investment category over any 3-year (and "5-year" and "10-year") measurement period."

63. Sonic's IPS thus instructs the use of peer comparison to evaluate investment performance in the Plan. However, this comparison is not relevant because Defendants' selections failed threshold selection and retention investigation criteria by consistently failing to beat their benchmarks.

64. As a threshold matter, it is pointless to pay additional fees for a manager to try and beat their benchmark if they are consistently and historically underperforming it. If a manager fails to beat their benchmark, regardless of peer performance, the participant is paying more to receive less than they would by simply asking a fund to passively track the benchmark. A prudent investor would review this information as a threshold matter.

65. Moreover, a benchmark index rarely changes its composition. There are no managers buying, selling, or trading the underlying stocks or bonds within an index.

66. The Restatement of the Law of Trusts (Third) § 100 cmt. b(1) specifically identifies as an appropriate comparator for loss calculation purposes, “return rates of one or more . . . suitable index mutual funds or market indexes (with such adjustments as may be appropriate).”

67. Likewise, Defendants were privy to this information through the annual fiduciary notices to retirement plan participants under the allowances of 29 CFR § 2550.404a-5.

68. Indeed, Sonic’s participant fee disclosure statement for 2022, provided pursuant to 29 CFR § 2550.404a-5, does not utilize peer evaluation metrics, but rather analyzes Sonic’s investments compared to “an appropriate broad-based securities market index”:

| Investment Option Name | Average Annual Total Return | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MFS Growth R6 Fund [9,12,G] | (as of 09/30/2022 quarter end) | | | | | | (as of 12/31/2021 year end) | | | | |
| | YTD Ret | 1-Year | 3-Year | 5-Year | 10-Year | Since Incept | 1-Year | 5-Year | 10-Year | Since Incept | Incept Date |
| | **-33.60** | **-28.22** | **5.52** | **10.29** | **12.65** | **13.45** | **23.76** | **24.76** | **19.26** | **19.11** | **8/2011** |
| Benchmark: **Russell 1000 Growth Index** | -30.66 | -22.59 | 10.67 | 12.17 | 13.70 | - | 27.60 | 25.32 | 19.79 | - | - |

***Sonic’s 10/12/2022 29 CFR § 2550.404a-5 Notice to Employees.***

69. Sonic’s IPS peer comparison factors create a low threshold that enables Sonic’s investments to remain on the participants’ limited menu of investment options, even when they are costly, exhibit style drift, and frequently turnover or trade their restricted holdings, as demonstrated in the table above and below.

70. A simple analysis of a few key data points relating to the Large Growth Stock Mutual Fund Category quickly demonstrates why utilizing a peer analysis for investment performance is inadequate:

***Facts as of 12/31/2020 about Large Growth Peers***

| ***A*** | ***B*** | ***C*** | ***D*** | ***E*** | ***F*** | ***G*** | ***H*** | ***I*** |
|---|---|---|---|---|---|---|---|---|
| *Peer Category* | Expense Ratio | Turnover Rate | Top-10 Holdings Percent | Number of Holdings | Equity Style Box | Risk Rating | Information Ratio 10-year | Style Large-Cap Growth |

| *A* | *B* | *C* | *D* | *E* | *F* | *G* | *H* | *I* |
|---|---|---|---|---|---|---|---|---|
| *Large Growth Cat. Avg* | 0.857 | 57.71 | 44.57 | 116 | Large Growth | D | 0.45 | 47 |

71. First, as outlined in Column B, the expense ratio for the Large Growth Category is 0.857% on average. That expense ratio is so high because portfolio managers manage the funds, and portfolio managers must be compensated. On the other hand, market indexes have zero expenses because there are no portfolio managers trading the holdings or positions.

72. Further, as outlined in Columns C, D, E, and G, the risks of such peer funds are high due to high turnover and concentration.

73. As indicated in Column C, nearly 60% (57.71%) of each large growth's peer's underlying stock holdings are sold by portfolio managers over a 12-month period.

74. Columns D and E illustrate how each peer portfolio manager concentrates 44.57% of investors' dollars into their "top-10" stocks, with only 116 stocks. For comparison, The Russell 1000 Growth index for the MFS Growth fund holds four times as many stocks (453).

75. Due to this high turnover and concentration, the risk rating is a "D": one notch above the worst rating.

76. The Information Ratio or "IR" (outlined in Column H) likewise demonstrates the inadequacy of peer funds as a comparison metric.

77. IR calculations are simple yet effective because the IR measures the risk-adjusted returns of a portfolio manager compared to her preferred benchmark. It is the most used metric for assessing the skills of a paid portfolio manager, such as those managing mutual funds' dollars in Sonic's Plan. Additionally, the IR employs a calculation known as the "tracking error," which is the standard deviation of alphas relative to the benchmark. The information ratio indicates how

much risk is taken to generate the fund's returns over its benchmark (alpha). Therefore, it specifically measures the portfolio manager's skill in selecting stocks or bonds and their success over time, or the consistency of alpha.

78. Take for an example of a ten-year tracking error of 2% per year, along with a positive alpha of 0.5% per year, which means the information ratio equals 0.5 divided by 2, resulting in an information ratio of 0.25.

79. In general, an acceptable IR is 0.5. Here, as demonstrated in Column H, the "risk" is four times the alpha, and thus, a portfolio manager with that information ratio should not be added to participants' menu. The peer portfolio managers have thus failed to meet the 0.5 threshold for demonstrating skill, implying that the mutual fund does not deserve to continue deducting their portfolio manager's compensation from investors' investment dollars.

80. Lastly, Column I illustrates the primary reason peers are inadequate for comparison purposes. To serve as a meaningful benchmark, the comparator must exhibit similar aims, risks, rewards, and characteristics. The peers in Column I have only 47% in large-growth stock holdings; therefore, they do not possess a predominance of similar holdings in the large-cap growth category.

81. Analysis of similar data from March 31, 2025, further reveals the ever-changing nature of peer funds:

***Facts as of 3/31/2025 about use of Large Growth Peers***

| ***A*** | ***B*** | ***C*** | ***D*** | ***E*** | ***F*** | ***G*** | ***H*** | ***I*** |
|---|---|---|---|---|---|---|---|---|
| *Peer Category* | Expense Ratio | Turnover Rate | Top-10 Holdings Percent | Number of Holdings | Equity Style Box | Risk Rating | Information Ratio 10-year | Style Large-Cap Growth |
| *Large Growth Cat. Avg* | 0.759 | 47.49 | 54.22 | 106 | Large Blend | E | 0.07 | 28.31 |

82. As compared to the prior data from 2020, expense ratios declined (*see* Column B) and turnover decreased slightly (Column C), but fund concentration rose 22% (Column D). The risk rating (Column G) is now the highest rating ("E"), due to the increase in the "Top-10 Holdings Percent" (Column D).

83. Critically, the portfolio managers shifted their holdings "style" from Large-Cap Growth to "Large Blend" stocks, while holding only 28.31% of investors' assets in their objective style.[5]

84. Further, the portfolio managers' skill assessment metric (the IR, column H), significantly worsened, indicating that peer portfolio managers in the large-growth stock mutual fund category should not be hired, and thus, their associated compensation should never be taken from investors like the Plan participants.

85. With regards to turnover rates, a turnover rate greater than 30% "warrants close analysis by investment professionals as it can suggest that the manager is not following a disciplined investment strategy."[6]

86. The average turnover rate (Column C) outlined in Table 1 and Table 2 was 53%, demonstrating the failures of the peer portfolio managers in the large-growth stock mutual fund category.

87. Upon information and belief, the Committee utilized Morningstar data for peer funds when monitoring and evaluating the investment options made available to participants in the Plan.

---

[5] *See* SEC www.sec.gov/edgar (last visited September 5, 2025).
[6] *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 210(6th Cir. 2024).

88. For the reasons outlined above, the Committee's reliance on peer comparisons rather than benchmark index comparisons to analyze the Plan's investment performance creates a low threshold that enables imprudent investments to remain on the participants' limited menu of investment options, even when they are costly, exhibit style drift, and frequently turnover or trade their restricted holdings.

89. Thus, the IPS does not conform to the Committee's duty of prudence under ERISA.

90. The Committee's improper reliance on peer funds contributed to the Committee's decisions to select and maintain imprudent investments in the Plan, including funds that are costly, exhibit style drift, and frequently turnover or trade their restricted holdings, including the MFS Growth Fund, the MFS Value Fund, and the ClearBridge International Growth Fund discussed in detail herein.

91. As a result of the Committee's imprudent investments, Plaintiff and the proposed class suffered losses equal to or exceeding approximately $50 million.

### E. The Committee Failed to Follow Sonic's IPS When Choosing Plan Investments

92. At all relevant times during the Class Period, the Committee acted as fiduciary within the meaning of 29 U.S.C. § 1002(21)(A) by exercising authority and control with respect to the management of the Plan and its assets.

93. As a fiduciary, the Committee was required to act in accordance with the documents and instruments governing the Plan, so long as those documents and instruments were consistent with ERISA.

94. At all relevant times during the Class Period, each IPS was a document or instrument governing the Plan within the meaning of 29 U.S.C. § 1106(a)(1)(D).

95. Nonetheless, at all relevant times during the Class Period, the Committee failed to act in accordance with the IPS and its corresponding fiduciary duties under ERISA by: (1) failing to conduct periodic reviews of the Plan's investment performance; and (2) choosing more expensive funds and share classes.

96. As a consequence of these breaches of fiduciary duty further outlined below, the Plan suffered millions of dollars in losses.

**F. The Committee Failed to Conduct Periodic Reviews of Investment Performance**

97. During the Class Period, all versions of the Plan's IPS required periodic review of investment performance and instructed the Committee to "meet periodically and, with the Investment Advisor's assistance, will cover the following investment performance-related topics: 1) Adherence to investment policies, guidelines and objectives; 2) The funds' risk-adjusted returns, absolute returns, and risk levels in light of the stated policies and objectives . . . "

98. During the Class Period, all versions of the Plan's IPS also indicated that: "[t]he Committee will . . . monitor subjective criteria which may impact investment performance over time which may include but not be limited to:

- Investment objective
- Portfolio management structure
- Portfolio management tenure
- Asset levels
- Eligible investments
- Expenses
- Risk measurements
- Portfolio diversification"

99. But, for the reasons discussed at length herein, the selection and retention of the MFS Growth Fund, MFS Value Fund, and the ClearBridge International Growth Fund met none of these criteria.

100. The Committee's failure to monitor investment performance resulted in losses to Plaintiff and the class, including but not limited to the losses caused by the selection and retention of the MFS Growth Fund, MFS Value Fund, and the ClearBridge International Growth Fund.

### G. The Committee Chose More Expensive Share Classes

101. During the Class Period each version of the IPS prohibited asset choices based on anything other than pecuniary benefits to participants.

102. Contrary to both Sonic's IPS criteria and ERISA's fiduciary duties, the Committee chose the more expensive Putnam 25 Class when cheaper, identically managed share classes were available.

103. The Committee's failure to follow the IPS and its breach of its fiduciary duties resulted in losses to Plaintiff and the class, including but not limited to the losses caused by the selection and retention of the Putnam 25 Class as discussed herein.

### H. The Committee Failed to Fulfill ERISA's Duty of Prudence When It Selected and Maintained the MFS Growth Fund, the MFS Value Fund, and the ClearBridge International Growth Fund

104. An ERISA fiduciary has a duty to create and follow prudent processes in selecting plan funds and managers.

105. In selecting funds for a plan, fiduciaries must "avoid unwarranted costs" by being aware of the alternative investments that may have "significantly different costs." Restatement (Third) Of Trusts Ch. 17, intro. note (2007); *see also* Restatement (Third) Of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir.), cert. denied, 519 U.S. 810 (1996).

106. Adherence to these duties requires analyzing statistical metrics of past risk-adjusted performance of funds and their managers and comparing them to available alternatives to determine whether a particular fund is appropriate for addition to the plan or if superior alternative investments are available.

107. An examination of the cost and fee structure of the funds selected for the Plan shows that the Committee did not have a viable methodology for selecting funds or controlling the costs and expenses of its investment options. Modern Portfolio Theory (MPT), Prudent Investor Rule (Restatement (Third) Trusts) and ERISA's prudent expert standards required the Committee to have a prudent methodology for making sure participants' money was spent wisely.

108. Sonic's IPS[7] states: "The Committee is charged with the responsibility for the prudent selection and ongoing monitoring of the investment options made available in each plan."

109. To assist the Committee in this function, the Committee is authorized and permitted to engage the services of an investment advisor. The Committee engaged the services of IRA Group to serve in that role here.

110. The IRA Group purportedly performs "An ongoing analysis of each of the client's fund offerings focusing on total return, risk-adjusted return, performance consistency, fund management, fees & expenses, and governance with individual recommendations to Retain, Watch or Replace."[8]

111. Upon information and belief, the IRA Group's investment advice served as the primary basis for the Committee's decisions to add, remove, or replace investments.

---

[7] Plaintiff refers to the IPS provided to Plaintiff herein, which was revised in August 2022.
[8] *Quarterly Performance Monitoring,* https://iragroup.com/institutional/, (last visited September 5, 2025).

112. But pursuant to the IPS, the Committee retains final authority over the addition and removal of Plan investments.

113. As described below, the Committee failed to institute, follow, and apply processes that are consistent with the competence, skill, effort, and diligence that is required of a prudent fiduciary because the Committee persistently selected funds carried higher costs and lower returns than available alternatives, including the MFS Growth Fund, the MFS Value Fund, and the ClearBridge International Growth Fund discussed in detail herein.

114. As a result of the Committee's imprudent investments, Plaintiff and the proposed class suffered losses equal to or exceeding approximately $50 million.

## I. The Committee Lacked a Prudent Process When It Selected and Maintained the MFS Growth Fund as a Plan Option

115. In 2014, the Defendants initially selected the MFS Growth R6 fund (the "MFS Growth Fund"), and participants directed $36,524,972 of their wages into that selection.

116. Defendants lacked prudence when selecting and maintaining the MFS Growth Fund as a plan option because the MFS Growth Fund failed to generate returns above its appropriate benchmark, the Russell 1000 Growth Index.

117. At all times relevant to this Complaint, Defendants should have identified that the MFS Growth Fund was and would underperform its benchmark considering the fund was high risk and had a higher expense ratio than available alternatives.

118. From 2019 to 2024, the Defendants' decision to include the MFS Growth Fund in the investment options for the Plan resulted in a loss of $28,032,844 for participants as compared to the appropriate benchmark (the Russell 1000 Growth Index).

### J. The MFS Growth Fund Consistently Underperformed, Losing over $28 Million to the Russell 1000 Growth Index

119. To analyze the prudence of selecting and maintain the MFS Growth Fund, one should compare the MFS Growth Fund to the Russell 1000 Growth Index, which was and is (for all times relevant to this Complaint): (1) the MFS Growth Fund's portfolio manager's preferred benchmark; (2) the "designated benchmark" for the MFS Growth Fund, as indicated in Sonic's 29 CFR § 2550.404a-5 notice; and (3) the SEC-prospectus benchmark. The Russell 1000 Growth Index is thus the appropriate broad-based securities market index with similar aims, risks, rewards, and characteristics.

120. A proper measure of the MFS Growth Fund's performance is the fund's information ratio ("IR").

121. The IR is one critical measure investors can use to keep an eye on fund performance and fund manager consistency.[9] As the apex or pinnacle of portfolio manager skill assessment, IR "can also be seen as a measure of the portfolio manager's skill at picking investments and their success over time, typically referred to as consistency of returns."[10]

122. Given the Sonic IPS' focus on "risk measurements" (*see* Sonic's IPS at 4, 6–10), applying the IR to analyze the performance of the MFS Growth Fund is appropriate.

123. IR is the best tool to assess the manager's skill in beating their benchmark. IR uses a different calculation called the "tracking error," or the measure of how much risk is being assumed to generate the fund's returns over its benchmark."[11]

---

[9] Charles Schwab, *How's That Fund Doing? Check the Information Ratio*, (June 20, 2024), https://www.schwab.com/learn/story/hows-that-fund-doing-check-information-ratio (last visited September 5, 2025).
[10] *Id.*
[11] *Id.*

124. As Investopedia notes, "[u]nlike the Sharpe ratio, which compares returns to risk-free investments like Treasury bills, the IR measures risk-adjusted performance against benchmarks like the S&P 500 index.[12] Therefore, IR is best positioned in assessing a manager's ability to earn their fee by consistently beating their benchmark.

125. "A higher IR (typically above 0.5) suggests a fund manager is consistently generating returns above their benchmark. To be meaningful, [one must] look at information ratios covering at least three years of a fund manager's performance—longer track records give you a better sense of their abilities."[13]

126. Using the MFS Growth Fund's alphas (its returns versus the Russell 1000 Growth Fund's returns) since the fund's inception in 1998 (for all portfolio managers), as well as the Committee's initial selection year of 2014, every one of the MFS Growth Fund's investment managers earned an average information ratio (IR) just above zero (0.04). The information ratio (IR) was so minuscule that, to assess the skill of each manager over the seventeen years from 1998 to 2014, the Committee would need to observe the MFS Growth Fund for 2,243 years (calculated at a confidence level of two standard deviations, or 95%).

127. Thus, the MFS Growth Fund was a coin toss by which the Committee used participants' wages to place a bet on the MFS Growth Fund in 2014 and retain it thereafter.

128. A prudent plan fiduciary would avoid choosing costly, untested, and unskilled portfolio managers due to the high risk associated with such a selection.

---

[12] Peter Gratton, *Information Ratio (IR): Definition, Formula, vs. Sharpe Ratio*, Investopedia ( May 16, 2025) https://www.investopedia.com/terms/i/informationratio.asp (last visited September 5, 2025).

[13] *Id.*

129. But when the Committee initially selected the MFS Growth Fund in 2014, the IR of the MFS Growth Fund had not reached 0.5 in the past 10 years:

***Plan year 2014 facts from MFS Growth SEC prospectus at www.sec.gov/edgar.***

| *Name* | *Information Ratio 10-year (2005-2014)* | *Information Ratio 5-year (2010-2014)* | *Information Ratio 3-year (2012-2014)* |
|---|---|---|---|
| *MFS® Growth* | 0.33 | 0.14 | 0.07 |

130. Nonetheless, the Committee added the MFS Growth Fund to the Plan in 2014.

131. Thereafter, the Committee did not remove the MFS Growth Fund from the Plan, even when the MFS Growth Fund consistently performed poorly.

132. Sonic's IPS focuses on monitoring periods over three-, five-, and ten-year periods. During the 2016 plan year monitoring period, the prospectus available to Defendants indicated that the MFS Growth Fund lagged behind its benchmark, the Russell 1000 Growth Index Benchmark, by an average of 2.3% per year from 2016 to 2019.

133. Between 2019 and 2023, the IR for the MFS Growth Fund never reached 0.4 and, in fact, decreased at an alarming rate—indicating that the poor performance was worsening over time.

134. Nonetheless, the Committee never removed the investment during the Class Period.

135. The MFS Growth Fund raised sufficient red flags that Defendants should have conducted a more thorough investigation during the Committee's periodic reviews of the MFS Growth Fund.

136. Upon information and belief, the Committee failed to conduct an investigation regarding the selection and/or retention of the MFS Growth Fund.

137. From 2019 to 2023, Plaintiff's and the Class Members' assets in the MFS Growth Fund averaged $59,764,109.60.

138. Given the average expense ratio was 0.53% per year, participants paid $316,749.78 annually for the MFS Growth Fund to outperform the Russell 1000 Growth Index, with their total fees 2019 to 2023 totaling approximately $3 million.

139. Of that $3 million, portfolio manager fees equaled $1,900,498.69.

140. Unfortunately, all the participants' fees were wasted because they were paid to a predictably underperforming fund.

141. From 2019 to 2024, the Defendants' decision to include the MFS Growth Fund in the investment options for the Plan resulted in a loss of $28,032,844 for participants as compared to the benchmark. The MFS Growth Fund's mean return during that time was 18.6%, while the Russell 1000 Growth Fund's mean return was 21.7%.

142. Instead of selecting and retaining this predictably underperforming option, the Committee at any time could have saved the participants millions of dollars by selecting or swapping in a fund that tracks MFS Growth Fund's benchmark, Russell 1000 Growth Index.

143. As of January 1, 2024, $67,103,794 of participants' hard-earned deferred wages were invested in the MFS Growth Fund.

144. Upon information and belief, despite its high risk and demonstrated underperformance, the MFS Growth Fund is still an investment option in the Plan.

### K. The Committee Ignored Red Flags When Selecting and Maintaining The MFS Growth Fund

145. A prudent fiduciary would have recognized in 2014 or anytime thereafter that the MFS Growth Fund was likely to underperform the Russell 1000 Growth Index benchmark in light of the MFS Growth Fund's high turnover and excessive fees.

146. The MFS Growth Fund was a high-risk choice when the Committee selected and maintained the fund as a Plan option because it had a high turnover rate and included a concentrated portfolio of stocks.

147. As one Court recently noted: “Turnover rates measure how often a fund changes its investments, with higher rates meaning the fund frequently buys and sells stocks or bonds.” High turnover rates result “in significant and material changes to the underlying assets and allocations of those assets.” Thus, “substantial turnover created transaction costs for the Funds. A turnover rate above 30% warrants close analysis by investment professionals as it can suggest that the manager is not following a disciplined investment strategy.”[14]

148. During the five years after Defendants initially selected the MFS Growth Fund (from 2014–2019), the MFS Growth Fund’s portfolio manager traded approximately one-third of all the fund’s holdings.

149. Nonetheless, the Committee maintained the MFS Growth Fund as Plan option.

150. The MFS Growth Fund was also a high-risk choice due to its concentrated portfolio.

151. From 2014 to 2024, the MFS Growth Fund held only 82 stocks.

152. In comparison, during the same timeframe the Russell 1000 Growth Index held four to five times that number in stocks under the large-growth stock category.

153. The concentration of participants wages in the MFS Growth Fund caused massive risks versus the Russell 1000 Growth Index.

154. Nonetheless, the Committee maintained the MFS Growth Fund as Plan option.

155. The MFS Growth Fund was also an expensive choice when the Committee selected and maintained the fund as a Plan option.

[14] *Johnson*, 122 F.4th at 210.

156. Defendants are "obliged to minimize costs" under ERISA Section 404(a)(1), subsections (A), (B), and (D).

157. The Uniform Prudent Investor Act (the "UPIA") likewise suggests that, when devising and implementing strategies for the investment and management of trust assets, plan fiduciaries are obligated to "minimize costs", and it cautions against "[w]asting beneficiaries' money[.]" UPIA § 7 (1994).

158. Thus, as courts recognize, "'[w]asting beneficiaries' money is imprudent.'" 122 F.4th at 221 (quoting *Tibble*, 843 F.3d at 1198).

159. Fees, including fees paid to a portfolio manager to manage a fund, are akin to negative compounding on a participant's annual returns.

160. In 2014, the MFS Growth Fund's portfolio manager charged seventy-six basis points, or 0.76%, in fees.

161. A quick comparison of the fees charged by similar large-growth stock mutual funds indicates that the MFS Growth Fund's fee is excessive. A plethora of peers charge half or less, including, but not limited to, the Vanguard US Growth Fund, VWUSX (the "Vanguard Fund").

162. A simple comparison of a participant's expected annual returns on funds invested in the MFS Growth Fund as compared to funds invested in a comparable fund with lower expenses (e.g., the Vanguard Fund) quickly demonstrates how the MFS Growth Fund wastes a participant's money, regardless of its performance.

163. A conservative estimate of a participant's expected annual returns (in stocks and bonds) ranges from 5% to 6%.[15]

[15] Since December 29, 1933, the US T-Bill 90 Day has returned 3.36% annually to investors, while the Dow Jones Industrial Average has returned 5.28% per year in capital gains, since January 2,

164. Assuming a 5% return, a Sonic participant who buys $10,000 of the MFS Growth Fund can expect an annual return of only 4.3% (5% less the 0.7% annual fee for the MFS Growth Fund). The final accumulation value or future value of that investment after six years equals $12,873 (present value of $10,000, six periods at 4.3% per year).[16]

165. On the other hand, if Sonic had chosen an alternative large-growth stock mutual fund that was forty basis points cheaper (e.g., the Vanguard Fund), assuming the same hypothetical 5% return, a participant who buys $10,000 in that fund can expect an annual return of 4.7% annually (5% less the 0.3% fee for the fund). The future value of that investment after six years equals $13,173, which is $300 more in total over six years.

166. Thus, a participant who invests in the MFS Growth Fund incurs a loss of $50 per year ($300 over 6 years).

167. The Restatement of Trusts provides that "[i]f the extra costs and risks of an investment program are substantial, these added costs and risks must be justified by realistically evaluated return expectations." Restatement (Third) of Trusts § 90.

168. The math is quite simple: to offset a 50% loss, an investment would need a 100% gain to break even.

169. Sonic's participants who invested in the MFS Growth Fund could only hope the MFS Growth Fund's manager would not only cover the 25% cost (plus trading expenses) but also consistently outperform the Russell 1000 Growth Index benchmark.

170. Unfortunately for the participants, the MFS Growth Fund did neither.

---

1900 (as of December 31, 2024). These returns do not include dividends, if any. Therefore, a return of four to six percent is what participants can expect annually.

[16] This calculation was completed using a future value calculation in Excel.

171. In 2019, participants spent a total of a total of $401,909 on the MFS Growth Fund's fee (seventy-seven basis points on the participants' $52,195,971 dollars invested).

### L. The Committee Lacked a Prudent Process When Selecting and Maintaining the MFS Value Fund as a Plan Option

172. In 2016, the Defendants initially selected the MFS Value Fund (the "MFS Value Fund"), and participants directed $22,545,192 of their wages into the Committee's selection.

173. Defendants lacked prudence when selecting and maintaining the MFS Value Fund as a Plan option because the MFS Value Fund failed to generate returns above its appropriate benchmark.

174. At all times relevant to this Complaint, Defendants should have identified that the MFS Growth Fund was and would underperform its benchmark considering the fund's style drift away from its intended focus on value stocks.

175. From 2019 to 2024, the Defendants' decision to include the MFS Value Fund in the investment options for the Plan resulted in a loss of over $19 million for participants as compared to the appropriate benchmark, the Russell 1000 Value Index.

### M. The MFS Value Fund's Poor Performance

176. The purported "benchmark" for the MFS Value Fund was the Russell 1000 Value Index, which was and is (for all times relevant to this Complaint): (1) the MFS Value Fund's portfolio manager's preferred benchmark; (2) the "designated benchmark" for the MFS Value Fund, as indicated in Sonic's 29 CFR § 2550.404a-5 notice;[17] and (3) the SEC-prospectus benchmark.

[17] *See* Contract/Plan ID Number: 3-03739; 10.12.2022 111117 Investment Option Summary - Page 5 of 14.

177. But the portfolio manager for the MFS Value Fund failed to match the Russell 1000 Value Index's holdings or possess holdings with similar risks, aims, rewards, and characteristics.

178. Thus, considering the significant style drift in the MFS Value Fund, the Russell 1000 Value Index is not the appropriate benchmark for analyzing the MFS Value Fund's Performance.

179. Rather, given the significant style drift in the MFS Value Fund, the appropriate benchmark fund to analyze the performance of the fund is the S&P 500 Index.[18]

180. According to Morningstar®, the S&P 500 Index held similar risks, goals, rewards, and characteristics as the MFS Value Fund during the Class Period.

181. Similarly, Defendants' IPS requires performance analysis to occur against similar risk profiles. See ¶ 38**.**

182. For example, in 2016 the MFS Value Fund had 33% in value stocks and the S&P 500 index had 34% in value stocks.

183. A comparison of the MFS Value Fund to the meaningful benchmark (the S&P 500 Index) quickly demonstrates that the fund performed poorly compared to the benchmark.

184. From 2013 to 2015, the MFS Value Fund lost 0.42% per year compared to the S&P 500.

185. Looking back further, from 2011 to 2015, the MFS Value Fund lost 0.57% per year as compared to the S&P 500.

---

[18] *See* Sonic's 29 CFR § 2550.404a-5 notices titled "Fiduciary requirements for disclosure in … plans" discussing "an appropriate broad-based securities market index"; Restatement of Trusts (Third) § 100 cmt. b(1) (identifying an appropriate comparator for loss calculation purposes as the "return rates of one or more…suitable index mutual funds or market indexes (with such adjustments as may be appropriate").

186. And even further, from 2006 to 2016, the MFS Value Fund lost 0.17% per year as compared to the S&P 500.

187. Nonetheless, Defendants added the MFS Value Fund as a Plan option in 2016.

188. The MFS Value Fund's performance as compared to the S&P 500 Index did not improve after 2016.

189. From 2015 to 2020, the MFS Value Fund lost an average of 4.6% per year as compared to the S&P 500 Index.

190. From 2017 to 2019, the MFS Value Fund lost 3.6% per year as compared to the S&P 500.

191. From 2018 to 2020, the MFS Value Fund lost an average of 7.03% per year as compared to the S&P 500.

192. As of 2019, the MFS Value Fund's 10-year loss as compared to the S&P 500 Index was 1.5% per year.

193. In 2021, the MFS Value Fund's three-year loss was 6.3% per year, and the five-year loss was 5.6% per year.

194. But despite the MFS Value Fund's poor performance, Defendants kept the MFS Value Fund as a Plan option in 2019 and beyond.

195. The MFS Value Fund undoubtedly performed poorly as compared to the S&P 500 Index because the MFS Value Fund was more vulnerable to volatility due to lackluster diversification.

196. The MFS Value Fund's portfolio manager concentrated investors' cash into a comparatively small number of holdings:

| *Plan Year* | *2024* | *2023* | *2022* | *2021* | *2020* | *2019* | *2018* | *2017* | *2016* |
|---|---|---|---|---|---|---|---|---|---|

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *MFS Value fund* | 71 | 73 | 73 | 77 | 76 | 89 | 89 | 95 | 97 |
| *S&P 500 mutual fund* | 507 | 508 | 505 | 510 | 513 | 513 | 517 | 514 | 517 |

197. The MFS Value Fund thus had over 80% fewer holdings than the S&P 500 Index from 2016 to 2024.

198. The MFS Value Fund's manager's concentration of investors' funds in fewer holdings increases vulnerability, in part because each stock carries more weight. A 20% price drop in the MFS Value fund necessitates a 25% price increase to recover. Similarly, a 33% loss requires a 50% increase to break even (33.33/66.67).

199. Predictably, from 2016 to 2024 the risk for the MFS Value Fund was much higher when compared to the S&P 500.

200. To receive these poor returns from the MFS Value Fund, the Plan participants paid approximately fifty basis points (or 10% of total expected annual returns) to the manager of the fund.

201. From 2019 to 2024, the Plan participants invested average wages of $31,593,547.

202. The Plan participants thus wasted $142,170.96 per plan year on fees for the MFS Value Fund, for a total of $853,025.77 from 2019 to 2024, paying more for lower performance as compared to a fund that tracks the S&P 500.

203. As of 2025, there were nearly 200 publicly traded mutual and exchange-traded funds that identified the S&P 500 index as their "best-fit" index.

204. If Defendants had chosen one of those funds that mimicked the holdings of the S&P 500 Index as a Plan option instead of the MFS Value Fund, Plaintiff and the Class would have had over $19 million ($19,269,141) more in their accounts during the Class Period.

205. Defendants thus lacked prudence when selecting and maintaining the MFS Value Fund as a Plan option by failing to note its poor performance.

### N. The Committee Ignored the MFS Value Fund's Alarming Style Drift When Selecting and Maintaining the Fund

206. Sonic's IPS repeatedly states that "[t]he Committee will...monitor subjective criteria which may impact investment performance over time which may include but not be limited to:

- Investment objective
- Portfolio management structure
- Portfolio management tenure
- Asset levels
- Eligible investments
- Expenses
- Risk measurements
- Portfolio diversification"

IPS at 4–10.

207. Likewise, the IRA Group promises to perform "An initial analysis of the client's fund offerings with individual recommendations to Retain, Watch or Replace."[19] Such analysis includes "[a]n analysis of the underlying holdings of each individual fund offering to ensure **consistency with the asset class and style representation intended for the plan**."[20]

208. The SEC requires a mutual fund's name to convey its portfolio manager's "objective" when the fund's name includes potential investment objective terminology.

209. Here, the inclusion of the word "value" in the MFS Value Fund's name indicates that the manager's objective was to focus on value stocks.

---

[19] https://iragroup.com/institutional/ (last visited September 5, 2025).
[20] *Id.* (emphasis added).

210. When Defendants initially selected the MFS Value Fund in 2016, Defendants should have noticed the style drift away from the fund's intended focus on value stocks.

211. According to the SEC prospectus,[21] at that time the MFS Value Fund had already experienced significant style drift. In 2016, 97% of the fund's holdings were not in value stocks.

212. Nonetheless, Defendants selected the MFS Value Fund as a Plan option in 2016.

213. Sonic's IPS further requires periodic "Review of Investment Performance" and instructs the Committee to "meet periodically and, with the Investment Advisor's assistance, will cover the following investment performance-related topics: 1) Adherence to investment policies, guidelines and objectives; 2) The funds' risk-adjusted returns, absolute returns, and risk levels in light of the stated policies and objectives . . . "

214. Upon information and belief, the Committee failed to conduct such periodic reviews.

215. For example, during the plan year of 2022, the MFS Value Fund deviated from its prospectus objective of "value" stocks, given that 71% of its holdings were not in value stocks.[22]

216. That deviation was but the latest for the MFS Value Fund, which had exhibited similar style drift for years. For example, in 2020, 83% of its holdings were not in value stocks.[23]

217. When a fund drifts so far astray from its original goal, it places in serious doubt whether the manager is using a diligent investment strategy suitable for this type of fund. This style drift was red flag the Committee should not have ignored.

---

[21] *See* www.sec.gov/edgar
[22] *See* Sonic's § 2550.404a-5 disclosure dated September 30, 2022.
[23] *Id.*

218. Defendants thus lacked prudence when selecting and maintaining the MFS Value Fund as a Plan option by failing to recognize its style drift away from its intended focus on value stocks.

219. Further, since 2016 Sonic has failed to ensure that the participants' 29 CFR § 2550.404a-5 disclosure were accurate because the MFS value fund no longer could accurately be classified as a "value" fund or compared to its original benchmark,

**O. The Committee Lacked Prudence when Selecting and Maintaining the ClearBridge International Growth Share Class**

220. In devising and implementing strategies for the investment and management of the Plan's assets the fiduciaries are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7. Similarly, this concept is also codified in ERISA, to "defray reasonable plan expenses." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

221. Shares of a mutual fund may be offered in different "share classes," corresponding to different shareholder rights and costs, such as different fee and "load" (i.e., sales) charges. Each class represents an identical interest in the fund's portfolio. All share classes of funds charge fees for the management of the assets of the fund. The cost may differ, but the investment product is identical—the managers, investment styles, and stocks are not merely similar but identical. The principal difference between the share classes is that the fund will charge different marketing, distribution, and service expenses depending on the class hosen. Generally, lowest cost class shares are available to larger investors, such as 401(k) and 403(b) plans like the Plan, since institutional investors make large fund share purchases, and higher-cost share classes are typically sold to retail investors.

222. An inexperienced and imprudent fiduciary may get stuck with more expensive share classes of the selected funds because they failed to perform their due diligence, or do not

know any better. However, "a pure heart and an empty head are not enough" to meet fiduciary duties. *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

223. The U.S. Department of Labor has stated that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics. One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds."[24]

224. The Defendants had access to these low-cost institutional share classes of mutual funds, as they could easily meet the minimum investment requirements.

225. In a blatant violation of their fiduciary duty to act prudently and responsibly, instead of monitoring and taking advantage of volume discounts in purchasing fund shares, the Defendants instead offered higher-cost fund share classes as investment options for the Plan. Thus, the Plans' fiduciaries wasted the assets of the Plans by failing to monitor the available share classes and to select the lowest share class of the funds for inclusion in the Plans' menus.

226. In 2019 Defendants added the ClearBridge International Growth I fund (the "ClearBridge I Fund") to the Plan.

227. In 2019, participants invested a total of $15,742,047 into the ClearBridge I Fund.

228. But Defendants could have selected a cheaper, identically managed share class of the same fund: ClearBridge International Growth IS (the "ClearBridge IS Fund").

229. In 2019, the ClearBridge IS Fund was 0.08% or eight basis points lower (or 10% cheaper) than the ClearBridge I Fund. The yield for the ClearBridge IS Fund was also 19.35% higher because it was reduced less by expenses.

---

[24] U.S. DEP'T OF LABOR PENSION & WELFARE BEN. ADMIN., STUDY OF 401(K) PLAN FEES AND EXPENSES § 2.4.1.3 (Apr. 13, 1998).

230. As of March 31, 2025, the ClearBridge I Fund was 13% more expensive than the ClearBridge IS Fund.

231. As of March 31, 2025, the ClearBridge IS Fund share class performed eleven basis points better than the ClearBridge I Fund share class due to the additional costs (the I Fund yielded 1.32% while the IS fund yielded 1.43%).

232. Higher costs or higher expense ratios decrease a mutual fund's price or value per share, which also lowers the Plan and Trust's total value and every participant's account balance (every day the markets are open).

233. Defendants thus failed to prudently select and monitor the ClearBridge share classes and violated their fiduciary duties to minimize costs by not replacing the more expensive share class I with the less expensive, better performing, and identically managed ClearBridge IS share class.

**P. Defendants' Pattern of Plan Mismanagement**

234. Not only did Defendants fail to prudently select and maintain funds in the Plan, but Defendants failed to perform other Plan duties as well.

235. In particular, Defendants failed to ensure their 29 CFR § 2550.404a-5 Annual Notices to participants were accurate as required by § 2550.4404(a)(1)(A) and (a)(1)(B).

236. In 2016, the Committee added the Columbia Small Cap Index Fund (the "Columbia Fund") as a Plan option.

237. According to the "Investment Option Summary" provided with Defendants' 29 CFR § 2550.404a-5 notice on September 30, 2022,[25] the Plan's description for the Columbia Fund

[25] Contract/Plan ID Number: 3-03739; 10.12.2022 111117 Investment Option Summary - Page 8 of 14.

indicated that "[t]he investment seeks total return before fees and expenses that corresponds to the total return of the **Standard & Poor's (S&P) SmallCap 600 Index**." (emphasis added).

238. Thus, the S&P SmallCap 600 Index was the appropriate broad-based securities market index for the Columbia Fund under 29 CFR § 2550.404a-5.

239. But Defendant's annual 404a-5 disclosures compared the Columbia Small Cap Index Fund's performance to a non-meaningful benchmark index: the Russell 2000 Index.

240. For example, in the September 30, 2022 notice, Defendants provided the 1-Year, 3-Year, 5-Year, and 10-Year purported "benchmark" information for participants, but it was for the Russell 2000 Index rather than the appropriate benchmark (the S&P SmallCap 600 Index).[26]

241. The Russell 2000 Index is not a meaningful benchmark with similar risks, aims, rewards, and characteristics to the Columbia Fund.

242. Defendants' annual 404a-5 disclosures thus did not compare the Columbia Fund's performance to the appropriate broad-based securities market index as required under 29 CFR § 2550.404a-5.

243. Defendants' annual 404a-5 disclosures comparison of the Columbia Fund to the Russell 2000 Index served to make the Columbia Fund appear more favorable to participants than it was.

244. Further, Defendants' failure to find and correct the error on the 404a-5 disclosure notices was but another example of Defendants' failure to properly monitor the performance of each Plan option.

---

[26] *Id.*

### Q. Defendants Violated ERISA's Duty of Loyalty by Selecting More Expensive Share Classes

245. ERISA fiduciaries must never sacrifice investment returns, take on additional investment risk, or pay higher fees to promote non-pecuniary benefits.[27]

246. The duty of loyalty—a bedrock principle of ERISA with deep roots in the common law of trusts—requires those serving as fiduciaries to act with a single-minded focus on the interests of beneficiaries.[28]

247. Whether a fiduciary has acted disloyally may be inferred from the facts and circumstances surrounding the fiduciary's conduct.[29]

248. A plan fiduciary may be liable for its investment manager's imprudent investment decision if the plan fiduciary actively participates in that decision through the authorization, approval, or direction of the same.[30]

249. Here, an analysis of the facts and circumstances surrounding Defendants' selection and retention of the Putnam Stable Value fund requires the inference that Defendants either acted for the benefit of someone outside of the Plan participants or lacked the basic common sense and processes to realize that their actions harmed the Plan.

---

[27] *See, e.g.*, *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014)

[28] *See* Uniform Prudent Inv. Act § 5 (1995); *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 298 (5th Cir. 2000); [28] *Cassell*, 285 F. Supp. 3d at 1062; *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002).

[29] *Fuller v. SunTrust Banks, Inc.*, No. 1:11-CV-784, 2019 WL 5448206, at *23 (N.D. Ga. Oct. 3, 2019); *Hugler v. Byrnes*, 247 F. Supp. 3d 223, 230 (N.D.N.Y. 2017); *see also Tussey v. ABB, Inc.*, 850 F.3d 951, 957 (8th Cir. 2017).

[30] *Harris*, 832 F. Supp. at 1178; *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987); *McGinnes v. FirstGroup Am., Inc.*, No. 1:18-cv-326, 2021 BL 97434, at *12 (S.D. Ohio Mar. 18, 2021).

## R. The Committee Ignored its IPS and Violated its Fiduciary Duty of Loyalty to Plan Participants by Choosing More Expensive Options that Benefited Other Parties at the Cost of the Participants

250. The governing body overseeing mutual funds, the SEC's Office of Investor Education and Advocacy, issued an Investor Bulletin to provide investors with information about share classes of mutual funds, stating:

> Some mutual funds offer investors different types of shares, known as "classes." **Each class invests in the same portfolio of securities and has the same investment objectives** and policies. But each class has different shareholder services and/or distribution arrangements with different fees and expenses. Because of the different fees and expenses, each class will likely have different performance results.[31]

251. The Office of Investor Education continues with: "The effect of different fees on different mutual fund share classes is compounded over time. . . The more fees you pay, the less money is invested in the mutual fund share class and the less you will earn—now and over time.[32]

252. In 2018, the Committee added the Putnam Stable Value Fund to the Plan, and participants directed $28,625,242 in wages into the fund.

253. All the Putnam Stable Value fund's share classes were and are identical except for costs. All have the same fund identifier (Fund Id FSUSA09AY0).

***Higher-Yielding Classes Available in 2018***

| *Name* | *Return Year 2018* |
|---|---|
| *Putnam Stable Value Fund: 10bps* | 2.4 |
| *Putnam Stable Value Fund: 15bps* | 2.35 |
| *Putnam Stable Value Fund: 20bps* | 2.3 |
| *(Sonic's) Putnam Stable Value Fund: 25bps* | 2.25 |

[31] *Mutual Fund Classes*, https://www.investor.gov/introduction-investing/investing-basics/glossary/mutual-fund-classes (emphasis added) (last visited September 5, 2025).
[32] *Updated Investor Bulletin: Mutual Fund Classes*, https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-61 (last visited September 5, 2025).

254. The same share classes were offered in the following years.

255. Initially, it is unclear which share class the Committee chose as it was not disclosed in their annual form 5500 disclosure. However, in 2021, the Committee either switched to a more expensive and lower-yielding share class or merely started disclosing the fact they previously decided to waste Plan participant money on a more expensive share class in violation of their IPS and their fiduciary duties.

256. It is unclear why the Committee would choose to pay more for the same product available at a cheaper rate when minimum deposit amounts are routinely waived upon request.

257. The Putnam 25 Class was more expensive than any other class:

***Putnam Stable Value Fund Classes Expense Ratios.***

| *Name* | *Net Expense Ratio* |
|---:|:---:|
| *Putnam Stable Value Fund: 10bps* | 0.22 |
| *Putnam Stable Value Fund: 15bps* | 0.27 |
| *Putnam Stable Value Fund: 20bps* | 0.32 |
| *(Sonic's class) Putnam Stable Value Fund: 25bps* | 0.37 |

258. As demonstrated above, the Putnam 25 Class was 0.15% (15 basis points) more expensive than the Putnam Stable Value Fund, class 10 (the "Putnam 10 Class").

259. But by investing in the Putnam 25 Class rather than the Putnam 10 Class, participants lost more than 0.15% in total returns.

260. The following table outlines (1) the annual returns of a hypothetical $100 investment in each of the Putnam Stable fund classes from 2019 to 2024; (2) the geometric mean return on the hypothetical $100 investment for each class from 2019 to 2024; and (3) the total growth of the hypothetical $100 investment from 2019 to 2024:

***Annual Returns of $100 Hypothetical Investment in Each Putnam Stable Class from 2019–2024***

| *Name* | *2019* | *2020* | *2021* | *2022* | *2023* | *2024* | *Mean return 2019 to 2024* | *Total growth* |
|---|---|---|---|---|---|---|---|---|
| *Putnam Stable Value Fund: 10bps* | 2.60 | 2.59 | 2.36 | 2.54 | 3.48 | 3.96 | 2.92 | 118.85 |
| *Putnam Stable Value Fund: 15bps* | 2.55 | 2.54 | 2.30 | 2.49 | 3.43 | 3.91 | 2.87 | 118.49 |
| *Putnam Stable Value Fund: 20bps* | 2.50 | 2.49 | 2.26 | 2.44 | 3.37 | 3.86 | 2.82 | 118.15 |
| *Putnam Stable Value Fund: 25bps* | 2.45 | 2.43 | 2.22 | 2.39 | 3.32 | 3.81 | 2.77 | 117.80 |

261. A simple subtraction of the total growth of the Putnam 25 Class (117.80) from the total growth of the Putnam 10 Class (118.85) demonstrates that the Putnam 10 Class grew 105 basis points (1.05%) more than the Putnam 25 Class from 2019 to 2024 (118.85 – 117.80 = 1.05).

262. Over a six-year period, that equates to an average of about seventeen and a half basis points (0.1745%) per year (1.05/6 = 0.175).

263. Thus, by investing in the Putnam 25 Class rather than the Putnam 10 Class, participants lost more than 0.15% in total returns.

264. In short, when Sonic chose to waste 0.15% more per year on expenses for this investment, it cost Plan participants 0.175% in annual returns.

265. The Committee's decision to select and maintain the Putnam 25 Class provided less interest/yield for participants than any other Putnam share class. As described above, this selection is especially inexcusable because the underlying product is the same except for expenses and yield. In essence, the Committee chose to pay more and receive less for the same manager's services and product.

266. The Committee's selection thus requires the inference that either they lacked processes to recognize this waste or prioritized another interest over that of the Plan participants.

267. The Committee failed to exchange the Putnam 25 Class for any of the cheaper classes after every quarterly review from at least 2021 to the present.

268. As of January 1, 2024, a total of $56,790,876 of participants' assets are invested in the Putnam 25 Class.

269. Since 2021 the participants' total assets invested in the Putnam 25 Class resulted in hundreds of thousands of dollars in losses to Plan participants.

**S. The Committee Engaged in Prohibited Transactions with IRA Group**

270. For the protection of plan participants and plan beneficiaries, ERISA § 406, 29 U.S.C. § 1106 broadly prohibits transactions between a plan and a "party in interest". Corresponding provisions of the Internal Revenue Code impose an excise tax on nonexempt prohibited transactions between a plan and a "disqualified person." A party in interest or disqualified person generally includes a fiduciary of a plan, a person who provides services to a plan, and the employer that sponsors a plan and its affiliates.

271. ERISA Section 1106(a)(1)(C) thus:

> . . . prohibits fiduciaries from (1) "caus[ing a] plan to engage in a transaction" (2) that the fiduciary "knows or should know . . . constitutes a direct or indirect . . . furnishing of goods, services, or facilities" (3) "between the plan and a party in interest." Its bar is categorical and does not remove from its scope transactions that were necessary or involved reasonable compensation. The exemptions in §1108 do not impose additional pleading requirements for §1106(a)(1) claims.

*Cunningham*, 145 S. Ct. at 1022.

272. The Supreme Court unanimously amplified this statement and the previous laws and resolved a circuit split in *Cunningham v. Cornell University*, holding that plan participants need only allege that fiduciaries engaged in a "prohibited transaction" under ERISA to bring an action for breach of fiduciary duty. The burden to prove that a prohibited transaction did not occur

falls to Sonic and its plan fiduciaries. Thus, the burden rests on the accused fiduciaries to demonstrate that the prohibited transaction met an applicable exemption.[33]

273. Even if the Committee members had a good heart, "[g]ood faith is not a defense to a prohibited transaction." The prohibitions of § 1106 apply "regardless of whether the transaction is 'fair' to the plan." The section 1106 bar is categorical and does not remove from its scope transactions that were necessary or involved reasonable compensation.

274. Prohibited transaction claims under ERISA § 406(a) are per se violations of ERISA and, thus, not derivative of breach of fiduciary duty claims.

275. At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. Defendants who are or were fiduciaries to the Plan during the Class Period have violated their fiduciary duties and engaged in prohibited transactions with Plan assets.

276. Sonic's IPS provides that (emphasis added):

> The Committee is charged with **the responsibility for the prudent selection and ongoing monitoring of the investment options** made available in each Plan. To assist the Committee in this function (in particular, in satisfying the prudent person rule), the Committee is authorized and permitted to **engage the services of investment advisor(s) who possess the necessary specialized competencies and experiences** to perform the tasks for which it has been engaged and deemed appropriate by the Committee (an "Investment Advisor").

277. Upon information and belief, Sonic engaged the services of IRA Group as an "Investment Advisor" under the IPS.

[33] 145 S. Ct. 1020.

278. The IRA Group was stated as Sonic's most recent Form 5500 Schedule C provider code: "SERVICE CODE 27 (Investment advisory (plan))".

279. However, the Committee could only delegate certain duties to an agency upon a showing that "the agent's employment was necessary, that the trustee entered into a reasonable contract of employment with the agent, and that the agent rendered services to the trust."[34]

280. But the Committee paid IRA Group an unreasonable fee—nearly $250,000 above reasonable pay for similar services—and IRA Group failed to provide necessary services, such as monitoring the investment performance of the MFS Value Fund, the Putnam Stable Value Fund, and the ClearBridge International Growth Fund.

281. The Committee thus engaged in prohibited transactions with IRA Group by overpaying it for unnecessary services from the participants and the trust.

**i. IRA Group's Compensation was Unreasonable**

282. ERISA only allows trust deductions for a covered service provider if they are necessary for the plan's operation. If necessary, they can be paid from the trust at a reasonable rate of pay.

283. The Trust and participants directly paid the IRA Group over $370,000 for its services for Plan years 2019 to 2024, as shown in the figure below.[35]

| 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| $60,000 | $67,500 | $102,500 | $70,000 | $70,000 | $74,000 |

[34] *See* A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees §555, p. 54 (3d ed. 2024). ("Critically, the common law of trusts 'placed the burden squarely on the trustee' to make that showing." (internal citations omitted).

[35] *See* Sonic Annual Return/Report of Employee Benefit Plan (2019-2023) from www.efast.dol.gov

284. Upon information and belief, IRA Group offers the same services to all plans, regardless of asset size.

285. In connection with SEC filings for the IRA Group's Principal (Douglas Brian Leeson) and Chief Compliance Officer (Judith Ann Jolley), the IRA Group indicated that IRA Group is not liable for their recommendations based on their clients' assets, and its services to Defendants are non-discretionary.[36]

286. Thus, to determine whether the IRA Group's compensation was reasonable pursuant to ERISA, one must examine both the hourly rate for IRA Group's employees (based on their levels of experience and expertise) and the time spent managing the Plan.

287. According to Fee Benchmarker® (Advisor Fee Almanac, 6th Edition, 2017) and "WinMore Plans, Level-Up: Benchmarking Your Retirement Practice other lessons from legends," (April 4, 2024), the median pay for principals and non-principals, and the median blended rate for investment advisory firm employees were as follows:

***Median Hourly Pay for Investment Advisory Firms.***

| INVESTMENT ADVISORY FIRM HOURLY RATES | | | |
|---|---|---|---|
| | **Principal** | **Non-Principal Professional** | **Blended Avg Rate** |
| **Median** | $300.00 | $163.00 | $231.50 |

288. According to the same compensation surveys,[37] the median hours per plan, based on plan size, were as follows:

---

[36] *See* https://adviserinfo.sec.gov/firm/summary/126246 (The IRA Group's certified statement from its Chief Compliance Officer). The firm's U.S. Securities and Exchange Commission (SEC) filing for "IRA GROUP, INC. (CRD # 126246/SEC#:801-70558), INVESTMENT RESEARCH & ADVISORY GROUP, INC., IRA GROUP, INC.," stated that they are not acting with discretion at item 5 "Information About Your Advisory Business - Regulatory Assets Under Management."

[37] Fee Benchmarker® (Advisor Fee Almanac, 6th Edition, 2017) and "WinMore Plans, 'Level-Up: Benchmarking Your Retirement Practice other lessons from legends'" April 4, 2024.

***Reasonable annual hours spent per plan, based on plan size.***

| HOURS SPENT SERVICING A 401K CLIENT, BY PLAN SIZE, ANNUALLY | | |
|---|---|---|
| **Plan Size** | **Median hours, 2017 Survey** | **Median hours, 2024 survey** |
| $1M | 10 | 23 |
| $5M | 20 | 31 |
| $10M | 30 | 36 |
| $25M | 40 | 44.5 |
| $50M | 50 | 47 |
| $100M | 60 | 58 |
| $200M | 65 | 65.5 |
| $500M | 110 | 65.5 |

289. Thus, the reasonable annual pay for an investment advisory firm would be as follows:[38]

***Reasonable Annual Pay for Investment Advisory Firm.***

| REASONABLE ANNUAL PAY FOR ALL BROKERS/ADVISORS (IF NECESSARY FOR PLAN OPERATION) | | | | |
|---|---|---|---|---|
| **Plan Size** | **Principal** | **Non-Principal Professional** | **Prin/Non-Prin Blend** | **2024 Survey, pay $300/yr** |
| $1M | $3,000 | $1,630 | $2,315 | $6,900 |
| $5M | $6,000 | $3,260 | $4,630 | $9,300 |
| $10M | $9,000 | $4,890 | $6,945 | $10,800 |
| $25M | $12,000 | $6,520 | $9,260 | $13,350 |
| $50M | $15,000 | $8,150 | $11,575 | $14,100 |
| $100M | $18,000 | $9,780 | $13,890 | $17,400 |
| $200M | $19,500 | $10,595 | $15,048 | $19,650 |
| **$500M (Sonic's size)** | **$33,000** | **$17,930** | **$25,465** | **$19,650** |

290. Notably, for plans with assets of $50M or more, firms spent less hours on retirement plans in 2024 than in 2017, due to the increase in use of technology to service the plans.

[38] Pursuant to *Lilly v. City of New York*, 934 F.3d 222, 229 (2d Cir. 2019), this table multiplies a reasonable hourly rate by the reasonable hours expended.

291. But even taking the higher 2017 number, IRA Group's rates far exceeded the reasonable annual rates for advisory services.

292. The average Plan asset size during the Class Period was $424M (closest to the $500 million category in the tables above.

293. As demonstrated in the table above, even if IRA Group utilized only principals to provide services to Defendants and the Plan during the plan years 2019 to 2023, the reasonable annual compensation would be $33,000 (bottom row of the table above).

294. IRA Group was paid an average of $74,000 from 2019 to 2023 (124% more each year).

295. Based on the reasonable rates above, IRA Group's compensation, even if their employment was reasonable and necessary for the Plan (which, as discussed above, it was not), still would have been unreasonable:

***Calculation of dollars taken in excess of ERISA § 406.***

| Plan year: | 2019 | 2020 | 2021 | 2022 | 2023 | Totals |
|---|---|---|---|---|---|---|
| *Reasonable Blended Average Advisory Firm Rate of $231.50/hour* | | | | | | |
| IRA Group dollars taken from Sonic (Sched C): | $60,000 | $67,500 | $102,500 | $70,000 | $70,000 | $370,000 |
| Reasonable pay, higher of '17 & '24 surveys: | $25,465 | $25,465 | $25,465 | $25,465 | $25,465 | $127,325 |
| *Excess if necessary for Sonic's Plan:* | *-$34,535* | *-$42,035* | *-$77,035* | *-$44,535* | *-$44,535* | *-$242,675* |
| *Excess if NOT necessary:* | *-$60,000* | *-$67,500* | *-$102,500* | *-$70,000* | *-$70,000* | *-$370,000* |

296. The Restatement of Trusts indicates that ". . . if expenses that are improper have been paid from the trust estate, the trustee ordinarily has a duty to restore the amount of the improper payment(s) to the trust . . ."

297. To compute lost earnings on excess expenses paid by the trust, calculation of lost earnings pursuant to the Department of Labor's Voluntary Fiduciary Correction Program (VFCP) Calculator is appropriate.[39]

298. Based on the principal total amount paid to IRA Group outlined in the table above (a total of $370,000), and pursuant to the VFCP Calculator, the Lost Earnings and interest from the IRA Group's imprudent plan-wide decision making and recommendations totaled $94,469.01.

299. Thus, the total prohibited expenditure (the principal and lost earnings) totaled $464,469.01 from 2019 to 2023.

300. Upon information and belief, the Committee failed to conduct a Request for Proposal ("RFP") at reasonable intervals.

301. In particular, the Committee failed to look externally at the marketplace to determine what comparable plans were paying their service provider to determine a reasonable fee.

302. Pursuant to IRC 6621(a)(2) and (c)(1), Defendants are required to restore participants' accounts back to the condition they would have been in but for Defendants' continuing decision to retain and outsource investment selection and monitoring to IRA Group.

**ii. IRA Group Selected and Maintained Imprudent Investments**

303. According to the "Investor Advisor Role" as outlined in Sonic's IPS, the IRA Group's responsibilities include: "Assisting the Committee with the review of the investment managers and investment performance of the investment options, on a periodic basis (or such other

[39] *See VFCP Calculator - Lost Earnings,* https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/correction-programs/vfcp/table-of-underpayment-rates; https://www.askebsa.dol.gov/VFCPCalculator/WebCalculator.aspx; IRC 6621 Table of Underpayment Rates, Table of Interest Rates, IRC 6621(a)(2) and (c)(1) Underpayment Rates from January 1, 2019, to 12/31/2024.

basis determined by the Committee), in comparison to their stated objectives and their relative performance and pricing as compared to their peers and designated benchmarks." IPS at 2.

304. IRA Group was the Plan's advisor who advised the Committee to add and retain the funds discussed herein and other imprudent investments during the Class Period.

305. The IRA Group touts on its website that it performs "An ongoing analysis of each of the client's fund offerings focusing on total return, risk-adjusted return, performance consistency, fund management, fees & expenses, and governance with individual recommendations to Retain, Watch or Replace."[40]

306. IRA Group failed to do so with respect to the MFS Growth Fund, the MFS Value Fund, the Putnam Stable Value Fund, and the ClearBridge International Growth Fund.

307. Accordingly, IRA Group failed to add value to Plan participants and IRA Group's compensation violated the prohibited transaction rules of ERISA section 406.

## VII. CLASS ALLEGATIONS

308. 29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

309. As an alternative to direct individual actions on behalf of the Plan, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

310. Plaintiff brings this action on behalf of himself and the Class, which is defined as: participants in and beneficiaries of the Plan but excluding Defendants; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of Sonic or is or was a partner, officer, director, or controlling person of Sonic, the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Sonic; Plaintiffs' counsel;

[40] https://iragroup.com/institutional/ (last visited September 5, 2025).

judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

311. The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are capable of common answers as those issues.

312. Plaintiff's claims are typical of the claims of other members of the Class because his claims arise from the same events, practices and/or courses of conduct described above.

313. Plaintiff's claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

314. Plaintiff will fairly and adequately represent and protect the interests of the Class.

315. Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

316. Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

317. Plaintiff is represented by counsel experienced in prosecuting ERISA class actions and with experience and expertise in litigation involving ERISA breaches of fiduciary duty and ERISA prohibited transactions.

318. The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly

situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

319. The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants engaged in prohibited transactions with respect to the Plan and fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

320. The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants engaged in prohibited transaction and breaches of fiduciary duties which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants engaged in prohibited transactions or breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

321. The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants engaged in prohibited transactions or

breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

322. A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties to the Plan.

323. The following factors set forth in Rule 23(b)(3) also support certification: a) the members of the Class have an interest in a unitary adjudication of the issues presented here for the reasons that this case should be certified under Rule 23(b)(1); b) no other litigation concerning this controversy has been filed by any other members of the Class; c) this District is the most desirable location for concentrating this litigation because (i) Sonic does business in this District; and (ii) a significant number of Class members are located in this District; and d) there are no anticipated difficulties in managing this case as a class action.

324. Additionally, or in the alternative, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to Defendants' liability to the Class for their allegedly imprudent and disloyal conduct.

## VIII. TIMELINESS

325. Within the six-year period prior to Plaintiff filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

326. At all relevant times during the Class Period, Defendants also made affirmative misrepresentations to participants about the security of their investments, the competence of the portfolio fund managers, the performance history of their investments, and the amount of investment fees they were being charged.

327. At all relevant times during the Class Period, Defendants intentionally concealed their fiduciary breaches and prohibited transactions to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

328. Plaintiff did not acquire actual knowledge of these violations until shortly before commencing this action.

329. Consequently, Plaintiff's claims in this action are timely under 29 U.S.C. § 1113.

### COUNT I: Breach of Fiduciary Duty of Prudence
### (Against all Defendants)

330. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

331. At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

332. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

333. As fiduciaries of the Plan, Defendants were subject to the duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aim.

334. At all relevant times during the Class Period, Defendants breached their fiduciary duty of prudence in multiple respects as discussed above.

335. Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Defendants failed to have a proper system of review in place to ensure, among other things, that: (a) participants in the Plan were being charged appropriate and reasonable fees for the Plan's third-party service providers; (b) their selection and retention of investment options were prudent; and (c) Plan expenses were reasonable and necessary.

336. At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best interests of the Plan participants. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more funds available to them for their retirement.

337. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties and must restore any profits resulting from such breaches.

338. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

**COUNT II: Breach of Fiduciary Duty of Loyalty**

339. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

340. At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

341. ERISA fiduciaries owe a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to act "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." *Id.*

342. The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id*. at 224 (quotation marks and citations omitted).

343. "Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988).

344. At all relevant times during the Class Period, Defendants breached their fiduciary duty of loyalty by prioritizing the interest of third parties over that of the Plan participants.

345. Defendants failed to only act with the exclusive purpose of providing benefits to participants by allowing unnecessary and excessive costs to diminish Plan participants retirement funds.

346. Defendants failed to act with the exclusive purpose of providing benefits to participants by choosing economically unfavorable options in exchange for more earnings for third parties at the expense of the participants.

347. As a direct and proximate result of Defendants' breaches of this fiduciary duty, the Plan and its participants suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

348. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches.

349. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

**COUNT III: Breach of Co-Fiduciary Duties**

350. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

351. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach;

(B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary unless he makes reasonable efforts under the circumstances to remedy the breach.

352. Each Defendant had the data and information available to them to discover or stop the fiduciary breaches.

353. Each Defendant knew and had the necessary data and information available to them to know of persistent manager underperformance, excessive risks, excessive manager costs, and opportunities for better performing investments.

354. Nevertheless, each Defendant chose to ignore, acquiesce, or participate in the ongoing breaches of fiduciary duty.

355. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT IV: Breach of Fiduciary Duty of Prudence**
**(Against Sonic)**

356. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

357. Defendant Sonic is the Plan Sponsor as defined by ERISA. 29. U.S.C. § 1002(16)(B). Sonic appointed individuals to serve on the Committee. Committee members served as fiduciaries of the Plan and at the discretion of Sonic. Sonic, at all relevant times, was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

358. Sonic, as the appointing fiduciary, had a duty to monitor the Committee at regular intervals to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan if the Committee was not fulfilling those duties.

359. Sonic also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to Sonic.

360. Sonic breached its fiduciary monitoring duties by, among other things: (a) failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions; (b) failing to monitor the processes by which the Plan's expenses and investments were evaluated; and (c) failing to remove the Committee as a fiduciary whose performance was blatantly inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, ignored its IPS in selection of funds and managers, and caused the Plan to pay excessive fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

361. Due to the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had Sonic complied with its fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

362. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendant Sonic is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committee. In addition,

Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**COUNT V: Violation of 29 U.S.C. § 1106(a) Prohibited Transactions**

363. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

364. ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C) bars a fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... furnishing of goods, services, or facilities between the plan and a party in interest."

365. ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to [the] plan". (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

366. ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

367. ERISA § 1108(b)(2)(A) exempts from § 1106(a)(1)(C) only transactions that involve "[c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other **services necessary for** the establishment **or operation of the plan, if no more than reasonable compensation is paid therefor**." (emphasis added).

368. Upon information and belief, at all relevant times Defendants were both fiduciaries and parties-in-interest subject to ERISA § 406(a)(1)(C) & (D).

369. Upon information and belief, at all relevant times IRA Group was a party in interest pursuant to 29 U.S.C. § 1002(14).

370. Defendants engaged in prohibited transactions by paying IRA Group for unnecessary services and in unreasonable amounts with Plan assets as detailed herein.

371. Defendants' inclusion of and failure to remove the imprudent funds in the Plan described above amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

372. Defendants' decision to agree to pay more to third parties as described amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

373. Defendants' agreeing to pay excessive fees to managers of funds amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

374. To the extent any of them are not fiduciaries, Defendants, as parties-in-interest, may be held liable for knowing participation in these violations of ERISA §§ 406(a)(1)(C) pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) regardless of whether they were ERISA fiduciaries.

375. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C).

**COUNT VI: Failure to Act in Accordance with Governing Plan Documents (ERISA, 29 U.S.C. § 1104(a)(1)(D))**

376. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

377. At all relevant times during the Class Period, Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A) by exercising authority and control with respect to the management of the Plan and its assets.

378. As fiduciaries, Defendants were required to act in accordance with the documents and instruments governing the Plan, so long as those documents and instruments were consistent with ERISA.

379. Defendants adopted the IPS (and a series of other Investment Policy Statements) during the Class Period that were in effect during the Class Period. Each IPS set forth the objectives of the Plan and policies and criteria to use in selecting, monitoring, and evaluating the Plan's investment options. At all relevant times during the Class Period, each Investment Policy Statement was a document or instrument governing the Plan within the meaning of 29 U.S.C. § 1106(a)(1)(D).

380. During the Class Period, all versions of the Plan's IPS required periodic review of investment performance and instructed the Committee to "meet periodically and, with the Investment Advisor's assistance, will cover the following investment performance-related topics: 1) Adherence to investment policies, guidelines and objectives; 2) The funds' risk-adjusted returns, absolute returns, and risk levels in light of the stated policies and objectives…"

381. During the Class Period, all versions of the Plan's IPS also indicated that: "[t]he Committee will...monitor subjective criteria which may impact investment performance over time which may include but not be limited to:

- Investment objective
- Portfolio management structure
- Portfolio management tenure
- Asset levels
- Eligible investments
- Expenses
- Risk measurements
- Portfolio diversification”

382. But the selection and retention of the MFS Growth Fund, MFS Value Fund, and the ClearBridge International Growth Fund met none of these criteria.

383. Likewise, during the Class Period each version of the IPS prohibited asset choices based on anything other than pecuniary benefits to participants.

384. Contrary to both Sonic’s IPS criteria and ERISA, the Committee chose the Putnam 25 Class not based on pecuniary benefits to participants.

385. As a consequence of the foregoing breaches of fiduciary duty, the Plan suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

386. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

387. Each Defendant also participated in the breach of the other Defendants, knowing that such acts were a breach, and enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties. Each Defendant knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary duties under 29 U.S.C. § 1105(a).

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A. Find and adjudge that the Defendants have breached their fiduciary duties, as described above;

B. Find and adjudge that the Defendants are personally liable to make good to the Plan the losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

C. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint the law firm of Milberg Coleman Bryson Phillips Grossman PLLC as class counsel;

D. Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

E. Impose a constructive trust over these profits;

F. Order the Defendants to make good to the Plan the losses resulting from each breach of fiduciary duty and to restore to the Plan any profits resulting from each breach of fiduciary duty;

G. Impose surcharge against the Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA

H. Apportion all amounts recovered for the Plan among the Plaintiffs and the Class;

I. Order that any amount to be paid to the Plan and/or accounts of Plaintiff and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

J. Require Defendants to pay attorneys' fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiff's counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action;

K. Award pre-judgment and post-judgment interest; and

L. Award any other such relief the Court determines Plaintiff and the Class are entitled to pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).

Dated: September 8, 2025

*s/David M. Wilkerson*
David M. Wilkerson
N.C. Bar No. 35742
**WILKERSON JUSTUS PLLC**
9 SW Pack Square, Suite 301
Asheville, NC 28801
Phone: (828) 316-6902
Email: dwilkerson@wilkersonjustus.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
Email: gklinger@milberg.com

Alexandr Rudenco*
Arlene Boruchowitz*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
800 S. Gay St., Suite 1100

Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com
aboruchowitz@milberg.com

**Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff and the Prospective Class*