# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL ACTION NO. 3:25-CV-00474-KDB-WCM

| | |
|---|---|
| JOSEPH HUGH NOLAN III, **Plaintiff,** v. SONIC AUTOMOTIVE, INC. ET AL., **Defendants.** | **MEMORANDUM AND ORDER** |

In this putative class action, Plaintiff Joseph Nolan III asserts that Defendants breached their fiduciary duties and violated the Employee Retirement Income and Security Act ("ERISA") with respect to two defined-contribution plans sponsored by Defendant Sonic Automotive, Inc. ("Sonic"). Now before the Court is Defendants' Motion to Dismiss (Doc. No. 14) Plaintiff's First Amended Complaint (Doc. No. 12). The Court has carefully considered this motion and the Parties' briefs and exhibits. For the reasons discussed below, the Court will **GRANT** the motion.

## I.    LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted" tests whether the complaint is legally and factually sufficient. *See* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012). A court need not accept a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

1

The Court, however, accepts all well-pleaded facts as true and draws all reasonable inferences in Plaintiff's favor. *See Conner v. Cleveland Cnty., N. Carolina,* 22 F.4th 412, 416 (4th Cir. 2022); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). In so doing, the Court "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Pa. Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, 932 F.3d 268, 274 (4th Cir. 2019). Construing the facts in this manner, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Pledger v. Lynch*, 5 F.4th 511, 520 (4th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).

When deciding a motion to dismiss, "a court considers the pleadings and any materials 'attached or incorporated into the complaint.'" *Fitzgerald Fruit Farms LLC v. Aseptia, Inc.*, 527 F. Supp. 3d 790, 796 (E.D.N.C. 2019) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Further, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). Ultimately, a motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

## II.     FACTS AND PROCEDURAL HISTORY

Plaintiff alleges that during the "Class Period" (six years prior to the filing of this action) he was a Sonic employee and a participant in the Sonic Automotive, Inc. 401(k) Plan & Trust (the "Sonic Plan" or "Plan"), a defined-contribution retirement plan. Doc. No. 12, First Amended Complaint ("FAC") ¶¶ 1–2, 7. In addition to Sonic, the named defendants in this putative class

action include Sonic's Northern California ULA 401(k) Plan[1] (the "California Plan" and collectively with the Sonic Plan, the "Plans"); the Echopark and Driveselect 401(k) Plan;[2] the Administrative Committee of Sonic Automotive, Inc. 401(k) Plan and Trust (the "Committee"); and John and Jane Does 1–30 in their capacities as members of the Committee. Sonic sponsors and administers the Plans, and the Committee and its members serve as fiduciaries responsible for selecting and monitoring investment options. *Id.* ¶¶ 11–14, 38.

During the relevant period, the Plans were comprised of mutual funds and common collective trust funds as investment options. *Id.* ¶ 44. In 2023, the Sonic Plan held approximately $491 million in assets and had 7,088 participants and the California Plan had approximately $32 million in assets and approximately 499 participants. *Id.* ¶ 43. Plan participants are permitted to allocate their account holdings into their choice(s) among numerous investment options and are able to change their allocations on a daily basis. *Id.* ¶¶ 45–46.

Plaintiff alleges that he and other participants in the Plans suffered financial losses because Defendants mismanaged the Plans and violated ERISA. *Id.* ¶¶ 1–2, 9. Specifically, Plaintiff alleges that Defendants breached their fiduciary duties by selecting and retaining "higher cost, lower-performing investment options" and by engaging in prohibited transactions with the Plan's investment advisor, the Investment Research & Advisory Group ("IRA"). *Id.* ¶¶ 3–4. According to Plaintiff, the Plan's Investment Policy Statement ("IPS")—which was intended to guide prudent investment selection—was "non-specific and vague" and lacked standard fund evaluation metrics such as expense ratio requirements, style consistency, and risk-adjusted performance measures. *Id.*

---

[1] Plaintiff does not allege he was a participant in the Californian Plan, but nonetheless seeks to assert claims related to that Plan and represent its participants. FAC ¶ 17.

[2] The the Echopark and Driveselect 401(k) Plan is included as a Defendant in the caption of the Amended Complaint, but not otherwise mentioned in the body of the pleading so it will be dismissed for lack of any asserted claim or supporting factual allegations.

3

¶¶ 52–60. Plaintiff further alleges that the IPS relied on "overly generous peer fund evaluation metrics" that allowed imprudent funds to remain in the Plan despite consistent underperformance relative to appropriate benchmarks. *Id.* ¶¶ 61–69.

Moreover, Plaintiff asserts that the Committee failed to follow the IPS—notwithstanding his contention that the document was itself imprudent—by not conducting required periodic reviews of investment performance and by choosing more expensive share classes when cheaper, identically managed alternatives were available. *Id.* ¶¶ 95–103. He alleges that these failures resulted in substantial losses to participants. *Id.* ¶¶ 96, 100, 103.

Plaintiff focuses on four funds in the Sonic Plan that he believes underperformed and /or were too expensive: the MFS Growth Fund ("Growth Fund"), the MFS Value Fund ("Value Fund"), the Putnam 25 Stable Value Fund ("Putnam 25"), and the ClearBridge "I" International Growth Fund ("ClearBridge I"). *Id.* ¶ 8. Plaintiff alleges that the Committee lacked a prudent process when selecting and retaining the Growth Fund, which "failed to generate returns above its appropriate benchmark, the Russell 1000 Growth Index," resulting in more than $28 million in losses from 2019 to 2024. *Id.* ¶¶ 116–118, 141. Plaintiff also asserts that the fund's information ratio was consistently too low to justify its higher fees, and that the Committee ignored "red flags" such as high turnover, concentrated holdings, and excessive costs compared to other funds. *Id.* ¶¶ 120–170.

Similarly, Plaintiff alleges that the Value Fund exhibited "significant style drift" away from value investing and consistently underperformed its appropriate benchmark, which Plaintiff contends to be the S&P 500 Index. *Id.* ¶¶ 174–195, 206–219. The fund also allegedly held far fewer stocks than the chosen benchmark and charged higher fees, causing participants to lose more than $19 million during the Class Period. *Id.* ¶¶ 196–205.

4

Plaintiff further alleges that the Committee imprudently selected ClearBridge I despite the availability of a cheaper, identically managed "IS" share class, resulting in unnecessary expenses and lower returns for participants. *Id.* ¶¶ 220–233. Likewise, Plaintiff contends that the Committee selected the Putnam 25 share class even though cheaper classes of the same fund were available and would have yielded higher returns. *Id.* ¶¶ 249–269. Although Plaintiff does not allege that the Sonic Plan qualified to purchase the cheaper share classes, he nevertheless asserts that minimum deposit requirements could be waived. *Id.* ¶ 256.

Beyond investment selection, Plaintiff asserts a broader "pattern of plan mismanagement," by the Committee, including inaccurate disclosures under 29 C.F.R. § 2550.404a-5, such as comparing the Columbia Small Cap Index Fund to the Russell 2000 Index rather than its stated benchmark, the S&P SmallCap 600 Index. *Id.* ¶¶ 234–244.

In addition, Plaintiff alleges that the Committee engaged in prohibited transactions by paying IRA unreasonable fees for services that were either unnecessary or not performed prudently. *Id.* ¶¶ 270–281. According to the FAC, IRA received more than $370,000 from 2019 to 2024—far above what Plaintiff alleges to be "reasonable compensation"—yet failed to provide adequate monitoring of the Plan's investments. *Id.* ¶¶ 282–307. Finally, Plaintiff alleges that Sonic failed to monitor the actions of the Committee. *Id.* ¶¶ 356–362.

As a result of these alleged actions and inactions, Plaintiff alleges that Defendants breached their fiduciary duties of prudence and loyalty to the Plans (Counts I and II); that Defendants breached their co-fiduciary duties (Count III); that Sonic breached its fiduciary duty of prudence by failing to monitor the Committee and its management of the Plans (Count IV); that Defendants engaged in prohibited transactions, in violation of 29 U.S.C. § 1106(a) (Count V); and that

Defendants failed to act in accordance with the governing plan documents, in violation of 29 U.S.C. § 1104(a)(1)(D) (Count VI).

## III.    DISCUSSION

### A.    Standing

As a threshold matter, Defendants assert that Plaintiff lacks standing to bring claims under the California Plan, because he did not participate in it. The Court agrees.

Federal courts are limited by the United States Constitution to deciding actual "cases" or "controversies," and this constitutional restriction requires plaintiffs to establish Article III standing for each claim and each form of relief they seek. U.S. Const. art. III, § 2; *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 431 (2021). To satisfy Article III, a plaintiff must clearly allege facts showing that he "(1) suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury was caused by the defendant; and (3) that the injury would likely be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Courts assess standing based on the facts as they existed when the complaint was filed and accept the merits of the plaintiff's legal claims as valid for purposes of the standing inquiry. *FEC v. Cruz*, 596 U.S. 289, 298 (2022); *Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 293 (4th Cir. 2022). If a plaintiff fails to establish standing, the court lacks subject-matter jurisdiction and must dismiss the matter. *Ali v. Hogan*, 26 F.4th 587, 595 (4th Cir. 2022).

"There is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020). ERISA plaintiffs, like all plaintiffs, must demonstrate a concrete injury in fact, and a statutory violation alone does not suffice. *Id.* at 544; *TransUnion*, 594 U.S. at 417 ("No concrete harm, no standing."). Even when suing in a representative capacity on behalf of a retirement plan, ERISA plaintiffs "still must have suffered an injury in fact, thus giving them a sufficiently concrete

6

interest in the outcome of the issue in dispute." *Id.* at 543. Accordingly, "participants suing under ERISA have the burden of showing that they personally suffered some actual or threatened injury as a result of the allegedly unlawful conduct." *David v. Alphin*, 817 F. Supp. 2d 764, 781 (W.D.N.C. 2011); *see also Peeler v. Bayada Home Health Care, Inc.*, No. 1:24-CV-00231-MR, 2026 WL 208630, at *5 (W.D.N.C. Jan. 27, 2026).

Plaintiff alleges that he participated in the Sonic Plan during the relevant period and invested in the four funds he claims performed poorly (the Growth Fund, the Value Fund, the Putnam 25, and ClearBridge I). FAC ¶ 8. Although he concedes that he did not participate in the California Plan, Plaintiff nevertheless contends that he has standing to assert claims relating to that plan because both Plans are "sponsored, maintained, and administered by Sonic and share the same fiduciaries," and because the alleged injuries are traceable "to the same challenged conduct." *Id.* ¶¶ 17–23. Plaintiff further argues that "[t]he First, Sixth, and Fifth Circuits have found that if Plaintiffs have standing with regard to one Plan, then the standing requirement is fulfilled [as to other plans], and the question becomes whether the Plaintiff is an adequate representative under Fed. R. Civ. P. 23 …" Doc. No. 21 at 20.

Notably, all of the decisions on which Plaintiff relies—none of which are binding on this Court—predate *TransUnion,* which explained the narrow scope of Article III standing and made clear that federal courts may entertain statutory claims *only* when the plaintiff can demonstrate a concrete, real-world injury stemming from the alleged violation. If "the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *TransUnion,* 594 U.S. at 423 (quoting *Casillas v. Madison Avenue Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)). In other words, a plaintiff must be able to answer the question "What's it to you?" *Id.* (citation omitted). But, with respect to the

California Plan, Plaintiff has no answer because he did not participate in the plan. No alleged ERISA violations could have caused him any injury. In sum, lacking any personal connection to the California Plan, Plaintiff has failed to establish Article III standing and his claims relating to that plan must therefore be dismissed.[3,4]

### B.  Breach of Fiduciary Duty of Prudence (Count I)

Plaintiff's first claim alleges that Defendants breached their fiduciary duty of prudence by (1) failing to follow an adequate process for selecting, monitoring, and retaining investment options for the Sonic Plan; (2) failing to follow Plan documents; and (3) failing to ensure that Plan fees and expenses were reasonable and necessary. For the following reasons, the Court concludes that Plaintiff has not plausibly alleged a claim for the breach of the duty of prudence.

An ERISA fiduciary must act "with the care, skill, prudence, and diligence that a prudent person acting in a like capacity and familiar with such matters would use." *Tibble v. Edison Int'l,* 575 U.S. 523, 528 (2015) (internal quotations omitted); *see also Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014); 29 U.S.C. § 1104(a)(1)(B). As § 1104 makes clear, the content of this duty turns on the "circumstances then prevailing," meaning the inquiry is inherently context-specific. *Reetz v. Aon Hewitt Inv. Consulting, Inc.,* 74 F.4th 171, 182 (4th Cir. 2023) (first quoting § 1104(a)(1)(B); and then citing *Fifth Third Bancorp,* 573 U.S. at 425; and then citing *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014)).

In the investment context, discharging the duty of prudence generally requires fiduciaries to "investigate, research, and review the options." *Id.* (quoting *Plasterers' Loc. Union No. 96*

---

[3] Similarly, Plaintiff does not allege that he invested in the Columbia fund. Therefore, insofar as Plaintiff alleges that Defendants breached fiduciary duties in connection with the Columbia fund, Plaintiff lacks standing to pursue such a theory.

[4] In any event, to the extent Plaintiff's claims and allegations with respect to the California Plan mirror the Sonic Plan, they fail for the substantive reasons discussed below.

*Pension Plan v. Pepper*, 663 F.3d 210, 216 n.8 (4th Cir. 2011)). A fiduciary therefore breaches its duty of prudence "by failing to investigate and evaluate the merits of his investment decisions," *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007) (cleaned up), or by "fail[ing] to properly monitor investments and remove imprudent ones." *Tibble*, 575 U.S. at 530.

But this duty is process-oriented, not results-oriented. *Reetz,* 74 F.4th at 182 (citing *DiFelice,* 497 F.3d at 420 ("[A] court must ask whether the fiduciary engaged in a reasoned decision-making process")). That is, in evaluating prudence claims, courts focus on whether the fiduciary engaged in a reasoned decision-making process, not whether the ultimate investment choice proved optimal in hindsight.[5] *Id.* (citing *DiFelice*, 497 F.3d at 424). "Prudence does not mean clairvoyance." *Id.* Thus, a fiduciary who "appropriately investigate[s] the merits of an investment decision prior to acting" readily satisfies this standard. *Tatum*, 761 F.3d at 358. Further, in the absence of allegations about a defendant's fiduciary process, the plaintiff's claims should be dismissed unless the plaintiff alleges other "facts that permit the court to reasonably 'infer from what is alleged that the process was flawed.'" *Kendall v. Pharm. Prod. Dev., LLC*, No. 7:20-cv-00071, 2021 WL 1231415, at *4 (E.D.N.C. Mar. 31, 2021) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)) (additional citations omitted).

### *Fund Selection*

Plaintiff first alleges that Defendants acted imprudently when the Committee, relying on the advice of IRA, selected the challenged funds. The initial selection of each of those funds, however, occurred outside of ERISA's six-year statute of limitations. *See* 29 U.S.C. § 1113 (requiring a plaintiff to file an ERISA breach-of-fiduciary-duty action no later than the

---

*earlier* ð̄ffor this reason, "an investment's diminution in value [after it was chosen] is neither necessary, nor sufficient, to demonstrate a violation of a fiduciary's ERISA duties." *DiFelice,* 497 F.3d at 424.

9

six years after the last act (or, for an omission, the last date it could have been cured) or three years after the plaintiff obtained actual knowledge of the breach).

Although Plaintiff asserts that he obtained actual knowledge of the alleged violations only shortly before filing this action, he also concedes that the initial selection of each challenged fund occurred before July 1, 2019—more than six years prior to the commencement of this suit. *See* FAC ¶ 328; *see also id.* ¶¶ 115 ("In 2014, the Defendants initially selected the MFS Growth … Fund"); 172 ("In 2016, the Defendants initially selected the MFS Value Fund"); 226 ("In 2019 Defendants added the ClearBridge International Growth … Fund")); 252 ("In 2018, the Committee added the Putnam Stable Value Fund"). Accordingly, Plaintiff's claim for violation of ERISA § 406(a) based on the initial selection of the challenged funds is time-barred and must be dismissed.

### Growth Fund Retention

Plaintiff next alleges Defendants acted imprudently by continuing to offer the Growth Fund even though it "lagged" its benchmark, had a "high" expense ratio, and had a "low" information ratio ("IR").

*Benchmark*

At the outset, Defendants assert that the Russell 1000 Growth Fund ("Russell Growth"), a passively managed index that the actively managed Growth Fund tracks, is an inappropriate benchmark. Doc. No. 16 at 11. Relying on *In re MedStar ERISA Litigation*, No. CV RDB-20-1984, 2021 WL 391701 (D. Md. Feb. 4, 2021), which cites wholly out of circuit case law, Plaintiff counters that benchmark selection cannot be resolved at the motion to dismiss stage. The Court disagrees. Courts have routinely held that when a plaintiff claims that a prudent fiduciary would have selected a different investment based on cost or performance, the plaintiff must provide a "sound basis for comparison." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018).

10

In other words, the complaint must identify a "meaningful benchmark." *Enstrom v. SAS Inst.*, No. 5:24-CV-105-D, 2025 WL 685219, at 3 (E.D.N.C. Mar. 3, 2025) (quoting *Meiners,* 898 F.3d at 822).

To survive dismissal, a plaintiff must allege facts showing that the chosen benchmark—or comparator—is sufficiently similar to the challenged fund to render the comparison meaningful. *See Kendall,* 2021 WL 1231415, at *9 ("Comparing actively-and passively-managed funds is like comparing apples and oranges and cannot create a meaningful benchmark.") (citation modified and additional citations omitted); *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020) (finding actively managed funds and passively managed index funds to be comparing apples and oranges, and concluding that "[c]omparing apples and oranges is not a way to show that one [fund] is better or worse than the other."); *Peeler,* 2026 WL 208630, at 8–9 (discussing the "requisite like-for-like comparison" for a benchmark and expanding its application to recordkeeping fees).

The comparison Plaintiff offers here, as in the numerous cases cited above, is plainly "apples to oranges"—Plaintiff contrasts an actively managed fund with a passive index. Therefore, the Court finds that Plaintiff has not plausibly alleged a meaningful benchmark.

*Information Ratio*

Plaintiff also contends that the Growth Fund's IR demonstrates imprudence. As Plaintiff's own sources explain,[6] an IR measures the degree to which a fund's outperformance relative to a benchmark reflects skill rather than risk, and longer measurement periods—typically at least three years—provide more reliable insight. Peter Gratton, Information Ratio (IR): Definition, Formula,

---

[6] The Court may properly consider these materials at the motion to dismiss stage because they are incorporated into and explicitly relied on in the FAC.

vs. Sharpe Ratio, Investopedia (June 18, 2025).[7] A positive IR indicates outperformance of the chosen benchmark on a risk-adjusted basis, and higher IRs suggest greater consistency. *How's That Fund Doing? Check the Information Ratio,* Charles Schwab (June 20, 2024)[8] ("Charles Schwab"). Put another way, the higher the IR, the better a fund's potential to "produce market-beating returns with low volatility and greater consistency over time." *Id.* Notably, although an IR greater than 0.4 is "considered good," funds with a low IR (less than 0.3) "may still be [] worthwhile," depending on individual investment strategies, because they still generate positive returns although they may have greater volatility and a higher tracking error (suggesting that they may be less consistent in beating the benchmark).[9] *Id.*

Yet, even if a fund's IR is suspect, selective reliance on a single performance metric is insufficient to suggest imprudence. *See Hall v. Capital One Fin. Corp., No.* 1:22-CV-00857-MSN-JFA, 2023 WL 2333304, at *4–6 (E.D. Va. Mar. 1, 2023) (holding that a Plaintiff failed to allege an imprudent process even when basing his allegations on the quarterly performance data of four Comparator TDFs, the S&P Indices, and the Sharpe ratio (a risk-adjusted ratio similar to the IR), and calling the Sharpe ratio "merely [an] additional measurement[] of investment performance" that failed to alter its analysis); *Tullgren v. Hamilton*, No. 1:22-CV-00856-MSN-IDD, 2023 WL 2307615, at *6 (E.D. Va. Mar. 1, 2023) (same). Indeed, Plaintiff's cited materials acknowledge that an IR "is only one piece of a mosaic and not an on/off switch. Each ratio you incorporate gives you a chance to see a potential investment from a different perspective." Charles Schwab.

---

[7] The URL is: https://www.investopedia.com/terms/i/informationratio.asp.

[8] The URL is: https://www.schwab.com/learn/story/hows-that-fund-doing-check-information-ratio.

[9] The Court notes that not all funds and not all investors seek investments with low volatility and high consistency. Indeed, some funds, including "growth" type funds, tolerate a higher degree of volatility in an effort to achieve higher returns.

Moreover, Plaintiff alleges that for the ten years preceding the Committee's selection of the Growth Fund, its IR was positive, and greater than 0.3. FAC ¶ 129. Although Plaintiff asserts that the IR declined from 2019 to 2023, he does not allege that it fell below zero, which would indicate underperformance—on average—relative to the benchmark. And, the IPS makes clear that it expects its chosen growth funds, such as the Growth Fund, to experience "greater volatility than overall equity market measurements." Doc. No. 23-1 at 10. Thus, a variable, yet positive, IR does not alone plausibly allege imprudence.

*Expense Ratio*

Finally, Plaintiff alleges that the Growth Fund's expense ratios were too high, causing it to underperform its benchmark by an average of 2.3% between 2016 and 2019, and 3.1% between 2019 and 2024.[10] FAC ¶¶ 132, 141. Even assuming that Russell Growth could be a valid comparator—which for the reasons already explained, it is not—minimal underperformance of one to four percent, without more, does not plausibly allege imprudence. *Enstrom,* 2025 WL 685219, at *5 (collecting cases). What's more, Courts routinely hold that alleged underperformance for three to five years is insufficient to plausibly allege imprudence. *See Hall,* 2023 WL 2333304, at *5 (concurring with the Sixth Circuit in *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1164 (6th Cir. 2022), which explained three and five year periods in which three actively managed funds trailed related index funds in their rate of return was insufficient, without more, to plausibly allege imprudence); *Kendall,* 2021 WL 1231415, at *9 (quoting *Davis v. Salesforce.com, Inc.*, No. 20-CV-01753-MMC, 2020 WL 5893405, at *4 (N.D. Cal. Oct. 5, 2020)

---

[10] Plaintiff alleges that the Growth Fund's average return during that time was 18.6%, while the benchmark, Russell Growth, returned on average 21.7%. FAC ¶ 141.

("[a]llegations based on five-year returns are not sufficiently long enough to state a plausible imprudence claim.")).

Plaintiff also asserts that had Defendants chosen a fund with a lower expense ratio, such as the Vanguard U.S. Growth Fund ("Vanguard Fund"), Plaintiffs would have had higher annual returns. Notwithstanding that Plaintiff does not allege that the Vanguard Fund performed better than the Growth Fund, a "fiduciary does not breach its duty of prudence by failing to offer the cheapest investment option," and ERISA does not require fiduciaries to "scour the market to find and offer the cheapest possible fund." *Kendall,* 2021 WL 1231415, at \*6 (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009)) (additional citations omitted). "Thus, choosing a fund with a higher expense ratio does not de facto breach the duty of prudence." *Id.* (first citing *Hecker*, 556 F.3d at 586; and then citing *White v. Chevron Corp.*, No. 16-cv-0793-PJH, 2016 WL 4502808, at \*11 (N.D. Cal. Aug. 29, 2016)). And, although "offering a mix of options does not insulate a plan if plaintiffs plead enough facts to plausibly allege a breach of the duty of prudence," *id.* (citing *Sweda v. Univ. of Penn.*, 923 F.3d 320, 329–32 (3d Cir. 2019)); the mere "availability of lower-cost alternatives is not enough to state a claim for a breach of the duty of prudence, especially where the challenged plan offers diversified investment options." *Id.* (citing *Divane v. Nw. Univ.*, 953 F.3d 980, 991–92 (7th Cir. 2020), *vacated and remanded sub nom. Hughes v. Nw. Univ.*, 595 U.S. 170, 211 L. Ed. 2d 558 (2022), and *opinion reinstated on reconsideration sub nom. Hughes v. Nw. Univ.*, 63 F.4th 615 (7th Cir. 2023)) (additional citations omitted). *See also Davis,* 960 F.3d at 485 (noting that it is not "imprudent to provide options with differing features from which to choose, regardless of whether some perform better than others.").

In summary, after considering Plaintiff's allegations independently and collectively, the Court finds that he has failed to plausibly allege that Defendants acted imprudently when they opted to retain the Growth Fund. Indeed, "ERISA does not … countenance opportunistic Monday-morning quarter-backing on the part of lawyers and plan participants who, with the benefit of hindsight, have zeroed in on the underperformance of certain investment options." *Patterson v. Morgan Stanley, No.* 16-CV-6568 (RJS), 2019 WL 4934834, at *17 (S.D.N.Y. Oct. 7, 2019).

**_Value Fund Retention_**

Plaintiff next alleges that Defendants acted imprudently by retaining the Value Fund on the ground that it underperformed the benchmark he believes should apply (not the listed benchmark, for which he makes no allegations of underperformance). Although the Value Fund tracks the Russell 1000 Value Index, Plaintiff asserts that the "Value Fund failed to match the Russell 1000 Value Index's holdings or possess holdings with similar risks, aims, rewards, and characteristics." FAC ¶ 177. Rather, Plaintiff contends that the S&P 500 Index is a more appropriate benchmark because, in his view, it reflects "similar risks, goals, rewards, and characteristics." *Id.* ¶¶ 179–80. Measured against that index, Plaintiff alleges that the Value Fund underperformed year over year and, as of 2019, lagged the S&P 500 Index by 1.5% over the preceding ten-year period. *Id.* ¶¶ 189–93.

While asserting that the S&P 500 Index is a meaningful benchmark because of its purported similarity to the Value Fund, Plaintiff at the same time appears to acknowledge that the S&P 500 lacks several features that would make it a meaningful benchmark. For example, Plaintiff admits that the Value Fund has substantially fewer holdings, a higher risk profile, and otherwise fails to mimic the S&P 500. *See id.* ¶¶ 197; 199 (noting the Value Fund has substantially fewer holdings

and a higher risk profile than the S&P 500 Index);[11] 204 (stating, "[i]f Defendants had chosen one of those funds that mimicked the holdings of the S&P 500 Index as a Plan option instead of the MFS Value Fund …," implying that the Value Fund does not). Moreover, as the Court has already explained, comparing an actively managed fund—such as the Value Fund—to a passively managed index, whether the S&P 500 Index or the Russell 1000 Value Index, is an "apples and oranges" comparison that does not plausibly establish a meaningful benchmark.

Plaintiff's allegations of underperformance fare no better. Even assuming the S&P 500 Index is an appropriate benchmark and accepting Plaintiff's assertion that the Value Fund underperformed the S&P 500 Index by as much as 7.03% between 2017 and 2019, underperformance over a three or even five year period is insufficient to plausibly allege imprudence. *See Hall,* 2023 WL 2333304, at *5; *Kendall,* 2021 WL 1231415, at *9. And over a ten-year lookback ending in 2019, Plaintiff alleges only a 1.5% shortfall, an allegation that likewise does not support a plausible inference of imprudence. *See Enstrom,* 2025 WL 685219, at *5.

Plaintiff's "style drift" theory is also unavailing. Accepting that theory would effectively require fiduciaries to "monitor the market and publicly available information about every holding maintained by every mutual fund included within the Plan, [and] the concentration of all stocks held by each mutual fund within the Plan." *In re Disney ERISA Litig.*, No. 16-02551, 2016 WL 8192945, at *4 (C.D. Cal. Nov. 14, 2016). "Such a duty would not be reasonable or appropriate," *id.,* and Plaintiff identifies no authority imposing such an obligation.

---

[11] Plaintiff compares the number of holdings in the Value Fund with the S&P 500 Mutual Fund, which is not the same as the S&P 500 Index Fund. *See* FAC ¶¶ 179, 196.

16

Accordingly, Plaintiff offers no factual allegations from which the Court may reasonably infer that Defendants' retention of the Value Fund was imprudent or that the Value Fund was otherwise unsuitable for the Plan's objectives based on its ongoing performance.

### *Putnam 25 and ClearBridge I Retention*

Finally, Plaintiff alleges that Defendants acted imprudently by retaining Putnam 25 and ClearBridge I because "cheaper, identically managed institutional share classes were available." FAC ¶ 102. With respect to Putnam 25, Plaintiff asserts that three identical but less expensive alternatives—Putnam 20, 15, and 10—were available. *Id.* ¶ 253. As to ClearBridge I, Plaintiff contends that Defendants should have selected the lower-cost institutional share classes because the "lowest cost class shares are available to larger investors, such as 401(k) and 403(b) plans like the Plan, since institutional investors make large fund share purchases, and higher-cost share classes are typically sold to retail investors."[12] *Id.* ¶¶ 221, 224.

It is true that, in some circumstances, allegations that "available alternative lower cost share classes were 'substantially identical,'" may plausibly allege imprudence, particularly where a plaintiff alleges that a fiduciary selected or retained "*retail* class funds when *institutional* shares were available." *McDonald behalf of Lab. Corp. of Am. Holdings Employees' Ret. Plan v. Lab. Corp. of Am. Holdings*, No. 1:22CV680, 2023 WL 4850693, at *7 (M.D.N.C. July 28, 2023) (emphasis added) (citations omitted). But this is not such a case. Here, Defendants already offered lower-cost institutional share classes for both funds, and Plaintiff does not allege that Sonic met the eligibility

---

[12] Plaintiff's own source explains that institutional shares "may have some of the lowest ongoing operating expenses, but there could be relatively high initial investment minimums and/or transaction fees to invest directly through a brokerage account. However, many mutual funds make these shares available to retail investors without requiring a high initial investment minimum through various means, including through an employer (e.g., through a retirement plan)."[12] U.S. Securities and Exchange Commission, *Updated Investor Bulletin: Mutual Fund Classes,* Investor.gov (Aug. 4, 2016).

requirements—such as Plan size or minimum investment requirements—for the cheaper institutional classes he identifies. Instead, Plaintiff asserts only his belief that such requirements could be "waived." FAC ¶ 256. Courts, however, have been skeptical of similar arguments. *See McDonald on behalf of Lab. Corp. of Am. Holdings Employees' Ret. Plan v. Lab. Corp. of Am. Holdings,* No. 1:22CV680, 2025 WL 2325016, at *22 (M.D.N.C. Aug. 12, 2025) (affording "little credence" to an expert opinion that it was possible for a fiduciary to negotiate its way into a lower-cost share class).

Although Plaintiff asserts that courts routinely reject arguments that plaintiffs "must plead that cheaper share classes were 'actually available,'" he unconvincingly cites out of circuit decisions that primarily address fiduciaries who offer expensive retail share classes of funds when the cheaper intuitional shares were accessible. *See* Doc. No. 21 at 7. Further, accepting Plaintiff's position would effectively mean that a fiduciary could face liability anytime it failed to select the absolute cheapest version of a fund (without even requiring an allegation that it was a qualified purchaser), a result this Court declines to endorse. As this Court has now explained multiple times, a "fiduciary does not breach its duty of prudence by failing to offer the cheapest investment option." *Kendall,* 2021 WL 1231415, at *6 (additional citations omitted). Plaintiff's position is particularly unwarranted where, as here, Plaintiff alleges no deficiencies in Defendant's decision-making process.

### *Advisory Fees*

Plaintiff next alleges that Defendants breached their fiduciary duty of prudence because the Plan paid excessive advisory fees to IRA. FAC ¶ 335; Doc. No. 22 at 21. According to Plaintiff, IRA recommended adding and retaining the challenged funds, and because those funds did not perform to Plaintiff's satisfaction, IRA purportedly failed to provide value to Plan participants, rendering its fees excessive and unnecessary.

18

The standard for pleading a plausible imprudence claim based on allegedly excessive advisory fees mirrors the standard for claims involving excessive recordkeeping fees. *Peeler,* 2026 WL 208630, at *10. To state such a claim, a Plaintiff must "allege that the challenged fees were excessive relative to the services rendered or otherwise allege factors relevant to determining whether a fee is excessive under the circumstance." *Id.* (quoting *Collins v. Ne. Grocery, Inc.*, No. 24-2339-CV, 2025 WL 2383710, at *3 (2d Cir. Aug. 18, 2025)).

Relying on a methodology for calculating reasonable attorney's fees,[13] Plaintiff multiplies the median hourly fee rates for one-time consulting projects for both principals and non-principal financial professionals (FAC ¶ 287; Doc. No. 15-4 at 31) by the median number of hours spent servicing a client by plan size[14] (FAC ¶ 288; Doc. No. 15-4 at 32). From this, Plaintiff concludes that IRA's annual advisory fees exceeded what he considered reasonable. *See* FAC ¶¶ 287–95; Doc. Nos. 15-4 Fee Benchmarker® (Advisor Fee Almanac, 6th Edition, 2017) ("Advisor Almanac"); 15-5 WinMore Plans, Level-Up: Benchmarking Your Retirement Practice (April 4, 2024) ("WinMore").[15] Defendants respond that the very same sources demonstrate that IRA's fees fall well below the medial advisory fees for plans of comparable size. Doc. No. 16 at 19–20 (citing Advisor Almanac at 98, 104; WinMore at 66).

---

[13] As support for his "reasonable fee" formula of "reasonable hourly rate" multiplied "by the reasonable hours expended," Plaintiff cites *Lilly v. City of New York*, 934 F.3d 222 (2d Cir. 2019). However, the *Lilly* Court uses the formula to calculate a reasonable attorney's fee, not the fee of a financial services advisory firm. *See Lilly,* 934 F.3d at 229 (finding a reasonable *attorney's fee* "should be determined by multiplying a reasonable hourly rate by the reasonable hours expended …").

[14] The Advisor Almanac notes that although it presents a chart listing the median annual hours spent servicing a client, by plan size, that "[o]nly 25% of advisors track and record the time spent servicing each client." Doc. No. 15-4 at 32.

[15] Again, the Court may properly consider these documents at the motion to dismiss stage because they are incorporated into and explicitly relied on in the FAC.

19

The Court is wholly unpersuaded by Plaintiff's attempt to repurpose the methodology for calculating reasonable attorney's fees as a framework for evaluating the compensation paid to a financial-services firm. Further, Plaintiff's reliance on hourly rates associated with one-time consulting projects provides an inadequate comparator for assessing the reasonableness of fees charged for ongoing annual advisory services. Indeed, Plaintiff's own sources don't support his claims. Because Plaintiff has not plausibly alleged that IRA's fees were excessive relative to the services provided, this claim will be dismissed.

### C. Breach of Fiduciary Duty of Loyalty (Count II)

Plaintiff next alleges that Defendants breached their fiduciary duty of loyalty by (1) selecting "economically unfavorable" fund options "in exchange for more earnings for third parties" (here, IRA), and (2) placing IRA's interests over those of Plan participants by paying "unnecessary and excessive" fees. FAC ¶¶ 343–47. As with the duty of prudence, the Court finds Plaintiff's duty of loyalty claim falls short.

ERISA's duty of loyalty requires that fiduciaries act "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(i)–(ii); *see Cunningham v. Cornell Univ.,* 604 U.S. 693, 696 (2025); *Reetz,* 74 F.4th at 181. The duty of loyalty is an "absolute command to exclude all selfish interest," *Tillery v. WakeMed Health & Hosps.*, --- F. Supp.3d ---, No. 5:25-CV-408-D, 2026 WL 125784, at *4 (E.D.N.C. Jan. 15, 2026) (quoting *Reetz*, 74 F.4th at 181) (internal quotations omitted), and a fiduciary must "make any decisions in a fiduciary capacity with an eye single to the interests of the participants and beneficiaries." *Id.* (quoting *DiFelice,* 497 F.3d at 418–19). To be sure, a fiduciary breaches its duty of loyalty when it, in its fiduciary

20

capacity, acts for any purpose other than the "exclusive benefit" of plan participants and beneficiaries. *See Tillery,* 2026 WL 125784, at \*4 (citations omitted).

However, a loyalty claim cannot merely "piggyback" on a prudence claim; it must rest on its own well-pleaded facts. *Peeler,* 2026 WL 208630, at \*11 (quoting *Kendall,* 2021 WL 1231415, at \*11). Likewise, allegations of imprudent conduct cannot be repackaged as a disloyalty claim absent additional, independent assertions. *Id.* (citation omitted).

Critically, Plaintiff's loyalty claim simply mirrors his prudence allegations and therefore impermissibly "piggybacks" on them. Plaintiff pleads no independent facts suggesting a disloyal motive or self-interested conduct by Defendants. On this basis alone, dismissal is warranted. Even setting that foundational deficiency aside, Plaintiff's allegations concerning the selection of each challenged fund are independently time-barred and cannot serve as the grounds for a fiduciary breach claim. Nor does Plaintiff's assertion that Defendants paid IRA unnecessary fees salvage the claim. The very materials Plaintiff cites show that the fees at issue were consistent with those charged by comparable service providers offering similar advisory services to similarly sized plans. *Compare* FAC ¶¶ 287–302 (citing Advisor Almanac and WinMore), *with* Doc. No. 16 at 19–20 (citing the same).

Finally, to the extent Plaintiff contends the fees were "unnecessary" because IRA recommended poorly performing funds, that argument is unavailing. The mere fact that Defendants selected and retained certain funds does not plausibly support an inference that the fees paid to IRA were unwarranted or that Defendants acted with an improper purpose, particularly where, as here, there are no allegations of self-dealing or less than arms-length transactions. Accordingly, Plaintiff has failed to plausibly allege that Defendants breached their fidcuciary duty of loyalty and this claim will be dismissed.

### D. Breach of Co-Fiduciary Duties (Count III)

In Count III, Plaintiff alleges that Defendants breached their co-fiduciary duties under ERISA. Co-fiduciary liability arises only in limited circumstances. *Reetz v. Lowe's Companies, Inc.*, No. 518CV00075KDBDCK, 2019 WL 4233616, at *7 (W.D.N.C. Sept. 6, 2019). Under 29 U.S.C. § 1105(a), a fiduciary is liable for the breach of another fiduciary if: (1) the fiduciary "knowingly participates in or conceals" the other fiduciary's breach; (2) the fiduciary's own failure to satisfy the duty of loyalty enables the other fiduciary to commit a breach; or (3) the fiduciary has knowledge of the other's breach and fails to make reasonable efforts under the circumstances to remedy it. *Peeler,* 2026 WL 208630, at *12. To establish a claim for co-fiduciary liability

> under (1) and (3), [P]laintiff[] must allege facts tending to show that the fiduciary knew that the other party was a fiduciary, that the co-fiduciary participated in the act constituting the breach, and that the act actually constituted a breach; under (2), [p]laintiff[] must show that the co-fiduciary's breach resulted from the fiduciary's breach of one of his duties.

*Reetz,* 2019 WL 4233616, at *7 (citing *Brink v. DaLesio,* 496 F. Supp. 1350, 1383 (D. Md. 1980), *rev'd on other grounds,* 667 F.2d 420 (4th Cir. 1981)).

However, co-fiduciary liability under § 1105(a) is derivative; that is, it requires a plausible underlying breach. As the Court has already dismissed Plaintiff's prudence and loyalty claims, there is no predicate breach on which a co-fiduciary claim may rest. *See Collins*, 2025 WL 2383710 (affirming dismissal of co-fiduciary claim where the alleged breaches of prudence and loyalty were not plausibly pleaded). On that basis alone, dismissal would be appropriate.

But the claim would fail even if Plaintiff had viable prudence or loyalty claims, because his allegations merely restate the statutory elements of § 1105(a). Plaintiff asserts that Defendants possessed sufficient information to uncover the alleged fiduciary breaches, yet either failed to act, ignored, or participated in the misconduct, and made no meaningful effort to remedy it. FAC ¶¶

352–55. But "mere recitals of the elements of a claim are insufficient to state a claim for relief." *Peeler,* 2026 WL 208630, at *12 (citing *Collins,* 2025 WL 2383710, at *5). And courts routinely dismiss co-fiduciary claims where, as here, the plaintiff alleges only that the fiduciaries "knew of each breach" and either participated in or failed to remedy them. *See Hainey v. SAG-AFTRA Health Plan,* No. 8:21-CV-02618-PX, 2023 WL 3645514, at *15 (D. Md. May 25, 2023) (dismissing co-fiduciary claim where the plaintiff alleged only that the "Board of Trustees knew of 'each breach' stemming from 'maladministration resulting in plan losses' and that they either knowingly participated in the breaches or took no steps to remedy the same."); *Atwood v. Burlington Indus. Equity, Inc.*, No. 2:92CV00716, 1994 WL 698314, at *15 (M.D.N.C. Aug. 3, 1994). Accordingly, Plaintiff has not stated a plausible co-fiduciary liability claim and Count III will be dismissed.

### E. Breach of Fiduciary Duty of Prudence Against Sonic (Count IV)

Plaintiff next alleges that Defendant Sonic, as the Plan's sponsor, breached its duty to monitor the Committee in violation of 29 U.S.C. § 1104(a)(1)(B). Count IV is also a derivative claim predicated on the Committee's alleged breach of the duty of prudence. Again, because Plaintiff has not plausibly alleged that the Committee acted imprudently, the duty to monitor claim—dependent on an underlying breach—fails as a matter of law. *Peeler,* 2026 WL 208630, at *12; *Collins*, 2025 WL 2383710, at *5; *Jacob v. RTX Corp.*, --- F. Supp .3d ---No. 1:25-CV-1389 (LMB/WBP), 2026 WL 173228, at *10 (E.D. Va. Jan. 22, 2026). Therefore, Plaintiff's duty to monitor claim against Sonic will be dismissed.

### F. Violation of 29 U.S.C. § 1106(a) Prohibited Transactions (Count V)

In Count V, Plaintiff alleges that Defendants engaged in prohibited transactions by: (1) including and retaining the challenged funds in the Plan's lineup; (2) using higher cost share

classes of the Putnam Stable Value and ClearBridge International Growth Funds; and (3) paying the IRA excessive fees. FAC ¶¶ 363–75.

ERISA § 406(a)(1) prohibits fiduciaries from causing a plan to engage in certain enumerated transactions with parties in interest. To state a claim under §406(a)(1), a plaintiff must demonstrate that "a fiduciary caused the plan to engage in the allegedly unlawful transaction" with a party in interest. *Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996).

### *Inclusion and Retention of the Challenged Funds*

Courts interpreting §406(a) have consistently held that the statutory term "transaction" requires an affirmative act by the fiduciary; thus, a mere failure to act, or a decision to maintain an existing investment, does not constitute a "transaction" within the meaning of the statute. *See, e.g., Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004) (explaining that the decision to *continue* holding employer stock "was not a 'transaction'"); *Tibble v. Edison Int'l*, 639 F. Supp. 2d 1122, 1126 (C.D. Cal. 2009) (concluding that a fiduciary's "failure to act" cannot constitute a prohibited transaction under §1106(a)(1)(D)).

The Fourth Circuit adopted this understanding in *David v. Alphin*, explaining that the "common understanding" of the term "transaction" necessarily implies an affirmative exchange or transfer, and therefore does not encompass a fiduciary's even repeated inaction. 704 F.3d 327, 340 (4th Cir. 2013). The court rejected as "untenable" the argument that a fiduciary's failure to remove an investment option at successive committee meetings constituted a series of new prohibited transactions. *Id.* at 341. Rather, the only actionable event for purposes of § 406(a) was the initial selection of the challenged investment option, and the limitations period ran from that point. *Id.* Following *David*, the court in *Johns v. Morris*, 802 F. Supp. 3d 854, 863 (E.D.N.C. 2025), likewise rejected this

"continuing violation theory," noting in addition that a fiduciary's repeated failure to remove an investment option similarly does not "renew" the limitations period with each alleged failure.

Here, as already discussed in detail above, the initial selections of each of the challenged funds occurred outside of ERISA's six-year statute of limitations. *See* 29 U.S.C. ¶ 1113. Accordingly, Plaintiff's claim for violation of ERISA § 406(a) related to the selection and retention of the challenged funds is time-barred and must be dismissed.

### *Excessive Advisory Fees & Higher Cost Share Classes*

Plaintiff next alleges that Defendants engaged in a prohibited transaction by paying excessive advisory fees to IRA. It is true that, at the motion to dismiss stage, a plaintiff "need only allege the three elements within § 1106(a)(1)(C)." *Cunningham,* 604 U.S. at 702. It is equally true, that a Rule 12(b)(6) motion tests only the sufficiency of the complaint, and courts "generally cannot reach the merits of an affirmative defense" on a motion to dismiss. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Still, the Fourth Circuit recognizes a narrow exception: where the complaint itself alleges all facts necessary to resolve an affirmative defense, the court may consider it on a motion to dismiss. *Id.* ("in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached …. This principle only applies, however, if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst,* 4 F.3d 244, 250 (4th Cir.1993)). That principle remains good law even in the wake of *Cunningham. See Nichols v. Bumgarner,* No. 24-7215, 2026 WL 1084251 (4th Cir. Apr. 22, 2026) (citing *Goodman* post-*Cunningham* for the same proposition).

This case presents precisely that "rare" circumstance. As the Court explained when dismissing Plaintiff's imprudence claim based on the same allegations, the very materials Plaintiff

incorporates into his FAC—and selectively quotes—demonstrate the reasonableness of IRA's advisory fees when viewed in context.[16] Because the FAC itself contains all facts necessary to resolve the issue, the Court may properly consider the affirmative defense at this stage. Accordingly, Plaintiff's prohibited transaction claim for excessive advisory fees fails.

### G.  Failure to Act in Accordance with Governing Plan Documents (Count VI)

Finally, Plaintiff alleges that Defendants failed to follow the Plan documents—specifically, the IPS—when they selected and retained the challenged funds.

Under ERISA, every "employee benefit plan shall be established and maintained" under "a written instrument." 29 U.S.C. § 1102(a)(1). And, fiduciaries "must follow" the governing plan documents and instruments, *Tillery,* 2026 WL 125784, at *3, unless they conflict with another of ERISA's provisions. *See* § 1104(a)(1)(D). Put simply, ERISA's statutory scheme "is built around reliance on the face of written plan documents" to ensure its "principal function" of "protect[ing] contractually defined benefits." *Tillery,* 2026 WL 125784, at *3 (quoting *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 100–01 (2013)).

As a threshold matter, Defendants assert, and Plaintiff concedes, that this claim—along with the remedy sought—is duplicative of Plaintiff's fiduciary duty claim in Count I. *See* Doc. No. 21 at 14 ("Defendants violated their plan document—and simultaneously their duty of prudence"). "As a matter of judicial economy, courts should dismiss a claim if it is duplicative of another claim in the same suit." *Graham v. Maryland*, 738 F. Supp. 3d 644, 656 (D. Md. 2024) (quoting *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010)). Claims are duplicative if they "stem from identical allegations, that are decided under identical legal standards, and for which

---

[16] Specifically, the Advisor Almanac and WinMore both support Defendants' argument that the fees paid to IRA were reasonable.

identical relief is available." *Doe v. Cmty. Coll. of Balt. Cnty.*, 595 F. Supp. 3d 392, 417 (D. Md. 2022) (quoting *Wultz,* 755 F. Supp. 2d at 81). Accordingly, the Court may dismiss this duplicative claim without further analysis.

But even if the claim were not duplicative, it would still fail. First and foremost, the Plan's IPS is not a governing plan document, as Plaintiff contends. *See* Doc. No. 21 at 15 (citing *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996) (explaining that ERISA § 1024(b)(4) requires disclosure of plan documents and "other instruments under which the plan is established or operated" and finding an IPS to be disclosable as a "formal document[] under which an ESOP is managed.")). *Faircloth* is readily distinguishable in this context. Although an IPS might be *disclosable* under § 1024(b)(4) under *Faircloth,* that does not mean that an IPS is automatically a Plan Document for purposes of 29 U.S.C. § 1104(a)(1)(D). Significantly here, the Sonic IPS itself made clear that it, along with "the standards, guidelines, and objectives" contained therein were "not binding."[17] Doc. No. 23-1 at 3. Indeed, the IPS explains that it was created to "provide a framework for the selection, management, monitoring and evaluation of the investment options" available to Plan participants to allow the Committee "sufficient flexibility" in "fulfilling its responsibilities with respect to [the] Plan." *Id.* Therefore, on its face, the Plan's IPS is not a written instrument that the "fiduciaries must follow."

To the contrary, the IPS goes on to explain that "the Committee in its discretion may determine that departure from the provisions of the Policy as well as alternate courses of action

---

[17] Courts may consider documents attached to a motion to dismiss only when the documents are "integral to and explicitly relied on in the complaint" and their authenticity is undisputed. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.,* 367 F.3d 212, 234 (4th Cir. 2004)). Here, the IPS is integral to and relied on in the FAC and Plaintiff has not disputed its authenticity. Accordingly, the Court may properly consider it.

may be necessary or appropriate from time to time." *Id.* And, well after the *Faircloth* decision, the Fourth Circuit determined similar non-binding language to be simply a "recommended" policy. *See Smith v. Shoe Show, Inc.,* No. 1:20CV813, 2022 WL 583569, at *9–10 (M.D.N.C. Feb. 25, 2022) (dismissing claim under § 1104(a)(1)(D) and explaining that allegations that the defendant failed to follow its investment policy because the investment options "were too expensive and insufficiently diversified" were "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," particularly where the investment policy was non-binding).

Here, as in *Shoe Show,* Plaintiff alleges Defendants violated a non-binding IPS when it selected and retained the challenged funds, because the funds failed to meet any of the IPS criteria. FAC ¶¶ 381–82. Specifically, Plaintiff alleges that the funds failed to meet the following subjective criteria: investment objective, portfolio management structure, portfolio management tenure, asset levels, eligible investments, expenses, risk measurements, and portfolio diversification. *Id.* ¶ 381. However, such "criteria" cannot be either achieved or not achieved by a fund; rather they are merely a list of fund attributes that the Committee monitors and that are helpful for evaluating and may impact investment performance over time. *See, e.g.,* Doc. No. 23-1 at 10. Thus, the Sonic IPS simply reflects a "recommended" policy that, by its terms, does not bind the Plan Committee.

Moreover, even if the IPS could be considered a binding Plan document, Plaintiff has, as discussed above, not established any plausible, viable claims of substantive wrongdoing by the Committee or Sonic with respect to the selection and retention of investments, including the choice of "more expensive funds and share classes." FAC ¶ 95.

In sum, these allegations are not only duplicative of Plaintiff's breach of fiduciary duty claims, but they amount to no more than "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Therefore, this claim will also be dismissed.

## IV.     ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1.  Defendants' Motion to Dismiss (Doc. No. 14) is **GRANTED**;

2.  Plaintiff's First Amended Complaint (Doc. No. 12) is **DISMISSED**; and

3.  The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED.**

Signed: April 30, 2026

Kenneth D. Bell
United States District Judge

29